Stanley D. NEWMAN, Lloyd H. Cooper, Michael A. Beylotte, James B. McNamara, Robert J. Huntsman, Benjamin Gutierrez, and David Bean, Plaintiffs,

and

Netco Towing Company, Limited, John C. Townsend, the United States of America, Anchorage Marine Services, Inc., and Spencer Robinson, Plaintiffs in Intervention,

v.

The VESSEL LADY ARNNETTE, Sometimes Known as Captain "D", her engines, tackle, apparel, etc. in rem

and

Detco Towing Inc., a South Carolina Corporation, Arnnette Detyens and William J. Detyens, Jr., in personam, Defendants.

Civ. A. No. 78–1073.

United States District Court,
D. South Carolina,
Charleston Division.

April 26, 1979.

A. Arthur Rosenblum, Barry I. Baker, Stephen E. Darling, Gordon D. Schreck, Charleston, S. C., for plaintiffs.

## ORDER

BLATT, District Judge.

This admiralty action was initiated by seven seamen, who filed a Complaint for seamen's wages on June 29, 1978. The Complaint named as defendants the vessel *Lady Arnnette*, sometimes known as the *Captain "D"*, *in rem*, and Detco Towing, Inc., Arnnette Detyens, and William J. Detyens, Jr. *in personam*. The Court subsequently authorized and directed the U.S. Marshal to seize the vessel and to transfer custody and possession of the vessel to William J. Detyens, Senior, who was appointed substitute custodian of the vessel.

A timely Motion to Intervene was filed by the United States of America on behalf of the Maritime Administration of the U.S. Department of Commerce. Because the United States demonstrated an interest in the vessel the protection of which would be impaired by an unconditional judicial sale of the vessel, and since that interest was not adequately represented by the original parties, the United States was permitted to intervene in the action in accordance with Rule 24 of the Federal Rules of Civil Procedure.

Four other parties similarly have intervened as Plaintiffs in this action, and present monetary claims against the Defendants. Netco Towing Co., Ltd. advances a maritime claim against Defendants for salvage. Anchorage Marine Services, Inc. and Spencer Robinson were permitted to intervene on the basis of their maritime claims for supplies and services furnished upon the credit of the vessel. John C. Townsend advances the sole non-maritime monetary claim against Defendants, for unpaid wages.

With its Motion to Intervene the United States filed a Complaint and a Motion for Summary Judgment praying that, should the vessel be sold by order of this Court, it be sold subject to those terms and condi-

tions under which the Vessel had originally been sold by the United States. Upon consideration of the pleadings and the papers submitted by the United States, and after hearing counsel for the respective parties, the Court has determined that there is no genuine issue of material fact pertaining to the particular claim of the United States and that the United States is entitled to judgment as a matter of law. The Court, therefore, makes the following findings of fact and conclusions of law and orders that the Motion for Summary Judgment of the United States be granted and that the vessel be sold subject to the terms and conditions required by the United States as more fully set forth herein.

*Findings of Fact*:

1. The Oil Screw *Lady Arnnette* is registered with the United States Coast Guard as the *Captain "D"*, Official Number 566594 (hereafter referred to as the Vessel). Originally the U.S.S. *Reindeer* (ATA–189), a U.S. Navy ocean tug, the Vessel was built in 1944, is approximately 143 feet in length, with a 34 foot beam and a 13 foot draft, of 610 tons displacement, and powered by a 1500 SHP diesel.

2. The Vessel was sold from the National Defense Reserve Fleet by the Maritime Administration of the U.S. Department of Commerce—(hereafter referred to as Mar-Ad). MarAd's standard operating procedure in ship disposals, and the one followed in disposing of the subject Vessel, is to select the vessels for sale, publish an invitation for bids, receive and publicly open the bids, evaluate the bids for responsiveness to the invitation and suitability of price, and make the award of the vessel (accepting the bid).

3. Vessels scheduled for disposal from the National Defense Reserve Fleet are only offered for sale under two conditions. Bids may be submitted by prospective buyers under either of these two conditions, at the bidder's option. Condition 1, known as the nontransportation use condition, provides that the buyer shall not use or operate the ship's hull, superstructure, or any structural component thereof, nor cause or permit same to be used or operated, as a means of or in aid in the transporting of passengers or cargo. Condition 2, known as the scrapping condition, requires that the buyer shall, within twenty-four months of the date of delivery, scrap the hull of the ship within the United States of America.

4. Since the National Defense Reserve Fleet ship disposal program began to operate in its current form in July, 1957, some two thousand two hundred and ninety-one (2,291) vessels have been sold encumbered by Conditions 1 or 2, three hundred and twenty-three (323) of which involved Condition 1 restrictions (approximately fourteen (14) percent). At present ninety-four (94) vessels in the National Defense Reserve Fleet are considered "nonretention" ships. In addition, MarAd is aware of some five (5) more vessels outside the reserve fleet scheduled for disposal within a year. All of these vessels will be sold by MarAd pursuant to Conditions 1 or 2, according to the bidder's option. All vessels sold from the National Defense Reserve Fleet would command substantially higher prices were it possible for MarAd to sell them without restrictions.

5. The Vessel subject to the present action was included in MarAd's Invitation for Bids No. PD–N–985, dated September 20, 1974. The original purchaser, Arctic Seafood Corporation of Miami, Florida, bid $16,666.66 for the Vessel under Condition 1, nontransportation use. This offer was accepted by MarAd on November 15, 1974, and the agreement was designated MarAd Contract No. MA–7621. The Invitation for Bids, with all the terms and conditions thereof, was expressly incorporated by reference into the Contract.

6. Conditions 1 and 2 were prominently featured in the Invitation for Bids, immediately under the caption. Condition 1, nontransportation use, was again discussed in Part IX (E) of the Invitation for Bids, while Condition 2, the scrapping condition, is found as Part IX (F).

7. Part IX (M) of the Invitation for Bids further provided that the buyer shall nei-

ther sell nor assign any of its rights or obligations under the Contract, nor resell any ship purchased, without prior written consent of MarAd. Part IX (N) further provides that all the covenants, stipulations, and agreements contained in the Contract are and shall be binding upon the respective heirs, administrators, executors, successors and assigns, if any, of the buyer and of MarAd.

8. The Bill of Sale, also dated November 15, 1974, recited that title to the Vessel was being transferred pursuant to the terms and provisions of the Contract of Sale and the Invitation for Bids, and explicitly recognized, among other things, a provision that the buyer shall not use or operate, or permit the use or operation, of the Vessel as a means of or in aid in transporting passengers or cargo. The Bill of Sale was filed with the U.S. Coast Guard and became a document of public record.

9. By letter dated March 31, 1975 Arnnette C. Detyens requested MarAd's permission to purchase the Vessel and assume all the terms and conditions of Contract No. MA–7621 under Condition 1, nontransportation use. Her stated intent was to use the Vessels as a fire fighting vessel to be operated within U.S. waters.

10. By Amendment No. 1 to Contract No. MA–7621, dated April 3, 1975, MarAd consented to the sale of the Vessel by Arctic Seafood Corporation to Arnnette C. Detyens. The transferee Arnnette C. Detyens agreed to be fully liable, obligated and responsible for the faithful performance of all the terms and conditions of the Invitation for Bids and the Contract of Sale, that the Vessel would be used for nontransportation purposes only, and that the Vessel would not be sold or otherwise transferred without the prior approval of MarAd. The Bill of Sale from Arctic Seafoods Corporation to Arnnette C. Detyens again specifically recited that the Vessel was not to be used as a means of transporting passengers or cargo. This Bill of Sale was also filed with the U.S. Coast Guard, and remained available for public inspection.

11. By letter dated May 6, 1975, Arnnette C. Detyens assured MarAd of her understanding of the manner in which the Vessel might be used in conformance with the terms of the sale. She indicated that she planned to charter the Vessel to Detco Towing, Inc. for use as a fire fighting vessel. In this letter she guaranteed that anyone to whom she chartered the vessel would understand the terms of the Contract, and she accepted full responsibility for any violations of the Contract.

12. By letter dated July 21, 1975, Ms. J. C. Fernanders, Chief of MarAd's Fleet Disposal Branch, indicated to Arnnette C. Detyens that MarAd had information to the effect that the Vessel had been used on several occasions for the transportation of cargo. By letter dated August 12, 1975, John C. Townsend, then Ms. Detyens' attorney, admitted certain violations and explained that Ms. Detyens was prepared to accept full responsibility for the violations. By letter of November 12, 1975, J. C. Fernanders assessed liquidated damages in the amount of $6,000 for breach of contract. These damages were assessed in accordance with the formula included in the Invitation for Bids. In order that the sum be payable in installments, a cognovit note was signed by Arnnette C. Detyens and her husband William R. Detyens—(also known in this action as William J. Detyens, Jr.)—on July 12, 1976. The note confessed the violations and promised payment of the full amount of liquidated damages.

13. On June 29, 1978, the Complaint for seamen's wages was filed in this Court, and a warrant for the arrest of the Vessel by the U.S. Marshal was issued on the same date. On July 3, 1978, the U.S. Marshal was directed to transfer custody and surrender possession of the Vessel to William J. Detyens, Senior, who was appointed substitute custodian of the Vessel.

*Conclusions of Law* :

I.

Rule 56(c) of the Federal Rules of Civil Procedure provides for the immediate rendition of a judgment in the event that the

matters considered by the Court on a motion for summary judgment disclose that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The instant case, where the United States of America as Plaintiff in Intervention has presented an issue of law relating to one aspect of the case, is particularly appropriate for summary judgment. The factual background is not complex, and consists entirely of uncontroverted signed documents such as contracts, letters and reports setting forth the chain of events leading to the intervention of the United States, and documents of public record such as Bills of Sale, federal statutes and Congressional reports. The legal issues are thus completely isolated by the documentary evidence presented. Where, as here, the facts are clear and no genuine issue of material fact underlying the particular claim of the United States as Plaintiff in Intervention remains for trial, the rule providing for summary judgment should control. *Kotmair v. Grey*, 505 F.2d 744 (4th Cir. 1974); *Kendall Elevator Co. v. LBC & W Associates of South Carolina, Inc.*, 350 F.Supp. 75 (D.S.C. 1972).

## II.

The National Defense Reserve Fleet was established under authority of section 11 of the Merchant Ship Sales Act of 1946 (Sales Act), 50 U.S.C.App. § 1744. Unless otherwise provided by law, all vessels placed in the reserve fleet are required by the Sales Act to be preserved and maintained by MarAd for the purpose of national defense. The Sales Act provides that a vessel placed in the reserve fleet shall in no case be used for any purpose whatsoever. The only exception to this prohibition is that any National Defense Reserve Fleet vessel may be used for the account of any agency or department of the United States during any war or national emergency where the emergency power of the President to requisition privately owned vessels is activated.

Originally, section 11 of the Sales Act permitted unrestricted use by the federal government during war or national emergency, Ch. 82, 60 Stat. 41 (1946). The Senate report states that " . . . one of the objectives of this legislation is the establishment of an inactive merchant vessel reserve only available for security needs, but frozen so far as commercial use is concerned, except in situations where the requisition power of the United States may be invoked. . . ." S.Rep.No. 807, 79th Cong., 1st Sess. 21 (1945). The Senate report further indicates that " . . . those vessels which are of no substantial utility now or in the future are to be scrapped under a continuing scrapping program which will include the retirement of tonnage as it becomes of no real utility for a modern merchant marine or for national security. In this connection it may be stated that the committee has recognized the desirability of establishing and maintaining a ship-breaking industry in this country and the desirability of encouraging the maintenance of key shipyards and key personnel essential to an efficient, modern shipbuilding industry." *Id.*, at 5. The House report substantially repeats the Senate report, H.R.Rep.No. 831, 79th Cong., 1st Sess. 13 (1945).

In 1950 section 11 of the Sales Act was amended to its present form, where the federal government's power to use vessels under national emergency conditions is restricted to inter-agency transfers, thus ending the use of government vessels for commercial operations of any kind. Ch. 427, 64 Stat. 308 (1950). The House report to the amending legislation stated that the changes were made "[i]n order to avoid competition by Government-owned ships with privately owned ships and to encourage new construction and continued development of a modern and well-balanced fleet . . . ." H.R.Rep.No. 2353, 81st Cong., 2d Sess. 5 (1950), U.S.Code Cong. & Admin. News 1950, pp. 2653, 2657. The Senate report is to the same effect, S.Rep.No. 1783, 81st Cong., 2d Sess. 4 (1950). It is thus apparent that in addition to restraining competition by the federal government with private ship operators, Congress was also concerned with maintaining the ship-

building and ship scrapping industries, and promoting new construction and development of the U.S.—flag merchant fleet, which objectives would not be served by the availability of previously constructed and technologically dated reserve fleet vessels.

Two statutory provisions in title V of the Merchant Marine Act of 1936, as amended (the 1936 Act), govern MarAd's authority to dispose of surplus reserve fleet vessels. They are sections 508 and 510(j) (46 U.S.C. §§ 1158 and 1160(j)). Section 508, which has not been amended in any relevant respect since its original enactment, provides that vessels acquired by MarAd which are determined to be of insufficient value for commercial or military operation to warrant their further preservation may be sold for scrap or for operation provided such operation is not in competition with any other U.S.—flag vessel in foreign commerce owned by a U.S. citizen. Section 510(j), which amended the 1936 Act in 1965, provides that all vessels acquired by MarAd shall be placed in the National Defense Reserve Fleet, and shall not be traded out or sold except as provided in sections 510(g) and 510(i) of the 1936 Act (46 U.S.C. §§ 1160(g), 1160(i)). Section 510(g) prohibits the use of obsolete reserve fleet vessels for commercial operation by the Government, and section 510(i) relates to an exchange program whereby MarAd is authorized to acquire modern vessels in exchange for obsolete reserve fleet vessels to be scrapped. Section 510(j) further qualifies its limitation on vessel disposal by providing that existing authority to dispose of vessels provided by other sections of title V or by titles VII or XI of the 1936 Act is not to be affected. Section 508 is the only other vessel disposal authority in title V, and no authority provided by titles VII or XI is relevant to the present inquiry.

MarAd has construed the Sales Act together with the vessel disposal authority provided by the 1936 Act. MarAd considers that the broad language of section 508 has been qualified by later legislation, and that Congress has imposed on the agency an unequivocal mandate to the effect that vessels placed in the reserve fleet shall not be sold for use or operation in competition with other vessels privately owned by U.S. citizens. The agency views its interpretation as consistent with the further Congressional purpose of maintaining the ship-breaking industry and stimulating ship-building and the development of a modern, well-balanced merchant fleet.

MarAd designed the reserve fleet vessel disposal program to conform with its perception of the Congressional mandate. The agency considers that, absent the enactment of a private law, the relevant statutes authorize only the following types of sales of obsolete reserve fleet vessels:

(a) Sales for complete scrapping in the United States,

or

(b) Sales for use or operation other than as a means of transporting passengers or cargo.

MarAd's vessel disposal program further requires that all purchasers agree not to resell any ship purchased without the prior written consent of MarAd, and that all the covenants, stipulations and agreements contained in the Contract of Sale and Invitation for Bids are and shall be binding on the purchaser's heirs, administrators, executors, successors and assigns. This vessel disposal program has existed in this current form since July 1957.

■ This consistent and long-standing interpretation of the relevant statutes by MarAd, the executive agency delegated the statutory responsibilities for reserve fleet vessel disposal, is entitled to great respect by the Court in construing the relevant statutes, and should be followed unless there are compelling indications that it is wrong. *E. g., Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Appalachian Power Co. v. Train*, 566 F.2d 451 (4th Cir. 1977). This principle has been applied to MarAd's interpretation of other provisions of the 1936 Act in *American Maritime Assoc. v. Stans*, 329 F.Supp. 1179 (D.D.C.1971), *aff'd* 157 U.S.App.D.C. 394, 485 F.2d 765 (1973). In

the case at hand, the Court finds no such compelling indications that MarAd's interpretation of its delegated vessel disposal authority is wrong.

■ MarAd's interpretation of its vessel disposal authority is further supported by the fact that the administrative program offering outdated reserve fleet vessels for scrapping or nontransportation use has existed since 1957, while the Merchant Marine Act of 1936 was substantially reenacted in 1970, 84 Stat. 1018. The U.S. Supreme Court has stated as a general principle that a long-standing administrative interpretation applying to a substantially reenacted statute is deemed to have Congressional approval and hence the force and effect of law, *C. I. R. v. Noel's Estate,* 380 U.S. 678, 85. S.Ct. 1238, 14 L.Ed.2d 159 (1965). Although this principle is more persuasive when it can be demonstrated that Congress was aware of the administrative construction at the time of the reenactment, *Mitchell v. C. I. R.,* 300 F.2d 533 (4th Cir. 1962), Congressional awareness may be presumed where, as here, the administrative construction is consistent and long-standing, *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), particularly when Congress has shown specific and repeated interest in the administratively construed sections prior to the reenactment.

■ In the lone instance where MarAd deviated from its established vessel disposal program, Congress was quick to close the perceived "loophole" in the pertinent statute. Section 510(j) of the 1936 Act was enacted as P.L. 89–254 in 1965 for that reason. The House report accompanying the bill addressed a MarAd plan to sell certain vessels on a stripped-down basis for use as barges. The House report indicated that sale of reserve fleet vessels even for such limited use and operation would be " . . . directly contrary to the intent of Congress when it established the reserve fleet under the Merchant Ship Sales Act of 1946 and provided that, except as otherwise expressly permitted, such vessels could not be disposed of. To close this loophole your committee has amended section 510 of the 1936 Act by adding a new subsection (j) . . . ." H.R.Rep.No. 597, 89th Cong., 1st Sess. 3 (1965), U.S.Code Cong. & Admin. News 1965, pp. 3562, 3564. The U.S. Supreme Court has frequently recognized that subsequent legislation declaring the intent of an earlier statute is entitled to significant weight, *e. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC, supra; FHA v. Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), and it is accorded such weight by this Court.

Congress specifically acknowledged that MarAd's vessel disposal program properly construed the statutes in question in 1977. Private Law 95–20 authorized MarAd to sell two obsolete reserve fleet vessels for conversion and operation as transportation and processing ships in the fisheries of the United States. The committee reports explicitly endorsed MarAd's construction of the relevant vessel disposal statutes, and concluded that special legislation such as Private Law 95–20 would be required for sale of any reserve fleet vessel for use or operation. H.R.Rep.No. 95–784, 95th Cong., 1st Sess. 2 (1977); S.Rep.No. 95–314, 95th Cong., 1st Sess. 2 (1977).

■ In light of the above analysis, the Court finds that Congress has repeatedly and consistently demonstrated the legislative purpose fulfilled by the reserve fleet vessel disposal program, and has clearly indicated the parameters within which that program is to function. MarAd's determination that, absent the enactment of a private law, the relevant statutes authorize sale only for scrapping or for nontransportation use of such reserve fleet vessels as are found to be of insufficient value for commercial or military operation to warrant their further preservation is fully supported by those statutes and will not be disturbed by the Court.

It was in the context of this Congressionally mandated vessel disposal program that MarAd offered the subject Vessel for sale for scrapping or for nontransportation use. The Vessel was in fact sold under Condition

1, nontransportation use. The facts reveal beyond question that both the original purchaser, Arctic Seafood Corporation, and the subsequent purchaser, Arnnette C. Detyens, understood the nature of the condition barring use or operation of the Vessel as a means of transporting passengers or cargo. Indeed, the record shows that where uncertainty even appeared to exist, the Chief of MarAd's Fleet Disposal Branch personally explained the nature of the condition. All pertinent documents prominently featured the existence of the nontransportation use restriction against the Vessel, including the Bill of Sale, which is filed with the U.S. Coast Guard and is of public record. The Invitation for Bids—(incorporated by reference into the Contract of Sale)—expressly states that all covenants, stipulations and agreements contained in the Contract are and shall be binding upon the respective heirs, administrators, executors, successors, and assigns, if any, of both the buyer and MarAd. In conformity with MarAd's intent and the understanding of the buyers, the nontransportation use condition was meant to pass with title to the Vessel.

For MarAd's National Defense Reserve Fleet disposal program to function as intended by Congress, it is vital that the Vessel not be sold by the Court free of MarAd's restrictions. The conditions imposed by the United States on vessels sold from the reserve fleet are the key components of a vessel disposal program established and operated in strict conformity with legislative mandate. Sale in admiralty of a vessel originally purchased from the reserve fleet subject to nontransportation use or scrapping restrictions, if accomplished without similar restrictions, would frustrate the intent of Congress and circumvent the statutory provisions expressing that intent.

Much more is at stake than the future of any one vessel, however; what is threatened is a defense reserve fleet vessel disposal program national in scope. For the Court to sanction a sale in admiralty of a former reserve fleet vessel without MarAd's restrictions, as urged by the creditors here, would establish a judicial mechanism whereby sham transactions could be litigated and title to such vessels freed of all restrictions. The great increase in market value of former reserve fleet vessels stripped of MarAd's restrictions would certainly prompt repeated attempts to clear such vessels of those restrictions through admiralty sales. The extent of potential abuse is manifest in the fact that over three hundred former reserve fleet vessels are presently owned by private citizens under nontransportation use restrictions, and close to one hundred vessels presently in the reserve fleet have been marked for sale by MarAd in the foreseeable future. The possibility that through Court proceedings sales for scrapping or nontransportation use can be converted to sales for unrestricted use in competition with citizen-owned private vessels and in disregard of the nation's ship scrapping and shipbuilding industries poses a severe threat to MarAd's disposal program and would contravene the result intended by Congress.

The harm which might befall low priority creditors in this action is beyond the power of the Court to remedy. The Congressional purposes defining the parameters of the reserve fleet vessel disposal program are quite clear, and the harm to that program which would result from a contrary decision is both immediate and serious. The Court is not inclined to favor the interests of lienholders against the Vessel and creditors of the Vessel's owner above the national interests in proper management of the National Defense Reserve Fleet, in promoting new construction and development of a modern and efficient U.S.—flag merchant fleet, and in maintaining the nation's shipbuilding and ship scrapping industries. This conclusion is particularly appropriate where, as here, the existence of MarAd's restrictions on the use of the Vessel was a matter of public record and readily obtainable by any prudent creditor.

▉ Since the primary obligation of the courts in cases involving statutory construction is to ascertain and declare the intention of the legislature (*e. g., United*

*States v. Cooper Corp.*, 312 U.S. 600 (1941); *Federal Ins. Co. v. Speight*, 220 F.Supp. 90 (D.C.S.C.1963)) and to carry such intention into effect (*e. g., Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)), it is concluded as a matter of law that the sale of the Vessel by this Court must be conducted pursuant to the same terms and conditions as were included in the Invitation for Bids and Contract of Sale by which the Vessel was originally sold by MarAd.

### III.

A second, separate basis for the Court's decision to grant the Government's Motion for Summary Judgment stems from a review of basic principles of admiralty and contract law.

 The nontransportation restrictions on the use of the Vessel do not constitute a lien on the vessel, nor do they involve any monetary claim or encumbrance, such as are normally fully executed by sale in admiralty. Gilmore & Black, The Law of Admiralty § ch.19, 9–20 (2d ed. 1975). Rather, the restrictions are contractual covenants, agreed to by the buyer, restraining the buyer's use of the vessel. As such these restrictions fall under the general legal heading of covenants in restraint of trade. Such covenants in restraint of trade are legal if the restraint is reasonable. Restatement (First) of Contracts § 514(19).

 It is established that a covenant by the buyer of property not to use it in competition with or to the injury of the seller does not impose an unreasonable restraint on trade unless effecting, or forming part of a plan to effect, a monopoly. *Id.,* § 516(b). However, the covenant may impose no restrictions greater than are required for the protection of the seller, may not impose undue hardship upon the buyer, and may not unreasonably restrict the alienation of the property or be based on a promise to refrain from competition. *Id.,* § 515.

 The restrictions imposed on buyers of National Defense Reserve Fleet vessels and on all subsequent heirs, administrators, executors, successors and assigns are reasonable in every respect and impose no conditions greater than are required for the protection of the interests of the Government. Considering that the nontransportation use restriction runs against a vessel with a limited life span, and that the Government's interests do not vary over the life of the vessel, the only reasonable time limitation is the life of the vessel. Considering the uses to which a vessel may be engaged, the territory which it may traverse, and the Government's interest in restricting competition by former reserve fleet vessels with privately owned vessels engaged in the carriage of passengers and cargo worldwide, it is again reasonable that the territorial extent of the restrictions be unlimited. That the restrictions do not unreasonably restrain the alienation of the property is demonstrated by the option exercised by Arctic Seafood Corporation to purchase this Vessel under the nontransportation use restriction rather than for scrapping, and the subsequent resale of the Vessel subject to that same nontransportation use restriction. Finally, the restrictions do not entail a promise by the buyer to refrain from competition, and do not in any respect infringe the buyer's right to conduct any business or engage in any form of competition. What the restrictions do accomplish is to prevent a particular range of uses of a particular vessel purchased far below market value in any competitive enterprise in which the buyer might be engaged. Buyers are fully aware of the restrictions before bidding for reserve fleet ships, and presumably take advantage of the reduced market value to acquire a vessel for a use which satisfies the restrictions. As is illustrated by this case, MarAd takes great care to ensure full comprehension of the meaning of the restrictions by all prospective purchasers. The Court, therefore, finds that MarAd's restrictions are valid and enforceable covenants in restraint of trade.

Only two cases have been found addressing the issue of whether such covenants in restraint of trade survive a judicial sale of a vessel in admiralty. A case decided by the Court of Appeals for the Third Circuit supports this proposition, albeit in dictum. In *Schaaf v. S.S. North America,* 368 F.2d 925 (3d Cir. 1966) the right of a former owner to intervene to preserve the former owner's rights under a restrictive covenant contained in a sale of the vessel became moot where a sale of the vessel was held and confirmed, and the vessel was released. The court said that, assuming arguendo that the relief requested could be granted, the relief must operate on the vessel itself and not on the substituted res—(the proceeds of the sale)—still in custody of the court.

A second, much stronger case addressed the issue on equitable grounds. In *Tri-Continental Corp. v. Tropical Marine Enterprises, Inc.,* 265 F.2d 619 (5th Cir. 1959) the U.S. Court of Appeals, Fifth Circuit, held that a restrictive covenant prohibiting the purchaser from engaging in certain transportation uses of a vessel was reasonable in time, territory and extent, and a valid and binding covenant in restraint of trade. In that suit to foreclose a mortgage on the vessel sold pursuant to the restrictive use covenant, plaintiff mortgagee prayed that the decree of foreclosure permit the vessel to be sold free of all restrictions on its use, arguing that such covenants do not run with chattels and are not enforceable against a non-assenting mortgagee. The original owner intervened in the action, asking that the vessel be sold by the court subject to the restrictive covenant. The court refused to consider the technical common law argument as to whether such covenants can legally "run" with a vessel. Rather, the court found it to be plainly inequitable, if not unconscionable, for the mortgagee, having itself furnished the money to make the purchase with full knowledge of the covenant, to deprive the beneficiary of the covenant's benefits and at the same time impose upon the former owner the heavy burden which would follow breach of the covenant.

These circumstances, although not congruent with the instant case, are similar enough to be instructive. Here, there is no "heavy burden" which would be imposed upon the Defendants, but the creditors can be charged with knowledge of the restrictions. As in *Tri-Continental,* it seems plainly inequitable for the beneficiary of the covenant—the U.S. Government—to be deprived of the benefits of that covenant through no fault of its own. It was the plain intention of the Contract that the restrictions would run ,with the Vessel against all subsequent heirs, administrators, executors, successors and assigns. The record repeatedly demonstrates that both Arctic Seafood Corporation and Arnnette C. Detyens clearly understood the nature of the restrictions. Each paid far less than market value for the Vessel because of the restrictions. Not only would an inequitable result follow were the beneficiary to be deprived of the benefit of the restrictions, but the courts would be opening the door to a variety of attempted sham transactions, where owners could net a substantial profit by permitting their vessels to be libelled and sold without the restrictive covenant. Indeed, should the Vessel be sold for unrestricted use and operation in this case, a sizeable windfall profit would revert to Arnnette C. Detyens. It seems patently inequitable to permit such a windfall to accrue to the benefit of the former owner, Ms. Detyens, where she was responsible for ensuring adherence of the covenant—(and for the consequences of its breach)—as well as for those acts and omissions which have resulted in the instant libel.

 Covenants in restraint of trade such as are addressed in this case are not liens or other monetary encumbrances on vessels and should not be extinguished by judicial sale where such an inequitable result as is described above would result. Admiralty courts are authorized to grant equitable relief, *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), and may apply equitable principles to subjects within their jurisdiction, *Schoenamsgruber v. Hamburg American Line,* 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989 (1935). Equity

and justice favor a judicial sale of the Vessel subject to the nontransportation use restrictive covenant. It is concluded that the general maritime law requires the survival of MarAd's conditions upon sale of the Vessel by this Court. Sale of the Vessel by the Court shall, therefore, be conducted pursuant to the same terms and conditions as were included in the Invitation for Bids and Contract of Sale by which the Vessel was originally sold by MarAd.

## IV.

Based on the foregoing, it is

ORDERED, that the Motion for Summary Judgment in favor of Plaintiff in Intervention the United States of America be, and the same hereby is, granted.

IT IS FURTHER ORDERED, that the United States Marshal of the District of South Carolina be and hereby is authorized and directed to sell to the highest bidder at public auction the Oil Screw Captain "D", Official No. 566594, sometimes known as the *Lady Arnnette,* her engines, machinery, tackle, equipment, and apparel, etc., upon the terms stated further in the Notice of Sale annexed hereto as Exhibit A. The date, time and place of sale shall be set by further order of this Court. The costs of advertisement and sale may be advanced by the said Marshal as an administrative expense and shall constitute a first charge against the proceeds of any sale.

IT IS FURTHER ORDERED that the said Marshal bring the proceeds of such sale into the Court, and deposit the same with the Clerk thereof pending the further disposition of this action upon the claim of the Plaintiffs, and pending final judgment herein.

IT IS FURTHER ORDERED, that since this decision involves a controlling question of law as to which there are substantial grounds for difference of opinion and that immediate appeal from this Order may materially advance the ultimate termination of this litigation, any adverse party is hereby granted the right to seek immediate relief in the Court of Appeals for the Fourth Circuit pursuant to 28 U.S.C. § 1292(b), and, pending the seeking of such relief, further proceedings in this Court are hereby stayed.

AND IT IS SO ORDERED.

## NOTICE OF SALE OF VESSEL

### (EXHIBIT "A")

In accordance with the Order of the Court to which this Exhibit A is annexed, the following Notice of Sale shall be published by the United States Marshal of the District of South Carolina in the Charleston News and Courier, Charleston, South Carolina.

Said Notice of Sale shall be made for 4 consecutive days prior to the date of sale.

## UNITED STATES MARSHAL'S SALE DISTRICT OF SOUTH CAROLINA

NOTICE IS HEREBY GIVEN that on May 21, 1979, at 11:00 AM, at the United States Court House Door, Broad and Meeting Streets, Charleston, South Carolina, the U.S. Marshal will sell to the highest bidder by public auction the Oil Screw CAPTAIN "D", Official Number 566594, also known as the LADY ARNNETTE, an ocean tug built in 1944, overall length 143 feet, beam 34 feet, draft 13 feet, of 610 tons displacement, powered by a 1500 SHP diesel. Specifications are not guaranteed.

The Marshal shall require of highest bidder at the sale a minimum deposit in cash, certified check or cashier's check, equal to five percent of the bid. The balance due shall be paid in cash, certified check or cashier's check within ten days of the sale.

The Vessel is to be sold "as is, where is" and the sale is subject to confirmation by the U.S. District Court for the District of South Carolina. The Vessel is now berthed at Cainhoy, South Carolina, State Road S–120, and may be inspected by any interested party at their sole risk and expense upon arrangement with the United States Marshal, United States Court House, Charleston, South Carolina, telephone number (803) 724–8364.

**532**

Sale may not be made to one who is not a U.S. citizen as defined in Section 2 of the Shipping Act, 1916, as amended.

Conditions of Sale:

The Bill of Sale for the Vessel will include one of the following two conditions, at the bidder's option.

Condition 1 : The Buyer shall not use or operate the Vessel, nor cause to permit same to be used or operated, as a means of or in aid in the transporting of passengers or cargo,

or

Condition 2 (Alternate) : The Buyer shall within twenty-four (24) months after the date of delivery, scrap the hulls of the ships within the United States.

The Bill of Sale for the Vessel will further include as a mandatory condition of sale that the Buyer shall not resell or assign the Vessel without prior written notice to the Fleet Disposal Branch, Maritime Administration, U.S. Department of Commerce, Washington, D. C. 20230. The Bill of Sale will also recite that all conditions included in the Bill of Sale are and be binding upon the respective heirs, administrators, executors, successors, and assigns, if any, of the Buyer.

> ANDREW J. CHISHOM,
> U. S. MARSHAL