821 F.2d 1571
 34 Cont.Cas.Fed. (CCH) 75,296
 AMERICAN PRESIDENT LINES, LTD., Appellee/Cross-Appellant,
v.
UNITED STATES, Appellant/Cross-Appellee.
 Appeal Nos. 86-1367, 86-1393.
 United States Court of Appeals,
Federal Circuit.
 June 2, 1987.
 
 Michael T. Paul, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., for appellant/cross-appellee. On the brief for appellant were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Joseph T. Casey, Jr., Atty., Commercial Litigation Branch, Dept. of Justice, of Washington, D.C. Also on the brief was J. Francis Ford, Dept. of Transp., Maritime Admission, of counsel.
 Timothy K. Shuba, Shea & Gardner, Washington, D.C., for appellee/cross-appellant. With him on the brief was Robert T. Basseches.
 Before DAVIS, Circuit Judge, SKELTON, Senior Circuit Judge, and NIES, Circuit Judge.
 SKELTON, Senior Circuit Judge.
 
 
 1
 In this case, that involves two trade-in agreements and two use agreements between the plaintiff American President Lines, Inc. (APL) and the defendant United States, which provide for the transfer of four obsolete ocean-going vessels from the plaintiff to the Government, with interim use by the plaintiff pending its construction of a new modern ship in a Government shipyard, the Claims Court reformed the agreements and awarded damages of one-half the lay-up costs of the obsolete vessels to the plaintiff against the Government in the sum of $1,146,364.00 in a decision reported in 10 Cl.Ct. 1 (1986). Both parties have appealed. We affirm in part and reverse in part.
 
 
 2
 The facts in the case are not in dispute, and are fully set forth in the opinion of the Claims Court, which we reproduce here, with a few changes, omissions and additions, as follows.
 
 Facts
 
 3
 APL is an operator of an ocean steamship service line. On November 21, 1978, the plaintiff submitted an application to the Assistant Secretary of Commerce for Maritime Affairs, to trade in certain obsolete vessels in exchange for an allowance of credit on the purchase and construction of a new MA Design C9-S-132a vessel, pursuant to authority contained in the Merchant Marine Act of 1936, as amended, (46 U.S.C. Sec. 1111 et seq. (1982)), (the Act). On April 30, 1979, based on the plaintiff's application, APL and the United States executed two trade-in agreements (with two supplementary use agreements), Contract No. MA-9180/9181 and Contract No. MA-9227/9228.
 
 
 4
 Under section 510 of the Merchant Marine Act of 1936, as amended, 46 U.S.C. Sec. 1160 (1982) ("section 510"), the United States Government is authorized to acquire obsolete vessels owned by private owners that are constructing new vessels in United States shipyards in exchange for an allowance of credit in an amount determined by the Secretary of Transportation at the time of the acquisition of the obsolete vessel. Section 510(b) provides:
 
 
 5
 Promotion of construction of new vessels; allowance on obsolete vessels
 
 
 6
 (b) In order to promote the construction of new, safe, and efficient vessels to carry the domestic and foreign waterborne commerce of the United States, the Secretary of Transportation is authorized, subject to the provisions of this section, to acquire any obsolete vessel in exchange for an allowance of credit. The obsolete vessel shall be acquired by the Secretary of Transportation, if the owner so requests, either at the time the owner contracts for the construction or purchase of a new vessel or within five days of the actual date of delivery of the new vessel to the owner. The amount of the allowance shall be determined at the time of the acquisition of the obsolete vessel by the Secretary of Transportation.
 
 
 7
 Owners are given trade-in credit allowances on obsolete vessels, based on fair and reasonable value as determined by the Secretary of Transportation.[1] If the United States acquires an obsolete vessel at the time the owner contracts for construction of its new vessel, the owner may continue to use the old vessel during the period of construction, with a reduction in the net trade-in allowance by an amount representing the fair value of such use as provided in the use agreements. Vessels acquired by the United States under section 510 may at the option of the Government, become a part of the United States' national defense reserve fleet for use in times of national emergency.
 
 
 8
 Section 510(d) of the Act establishes criteria for determining trade-in allowances:
 
 
 9
 The allowance for an obsolete vessel shall be the fair and reasonable value of such vessel as determined by the Secretary of Transportation. In making such determination the Secretary of Transportation shall consider: (1) the scrap value of the obsolete vessel both in American and foreign markets, (2) the depreciated value based on a twenty or twenty-five year life, whichever is applicable to the obsolete vessel, and (3) the market value thereof for operation in the world trade or in the foreign or domestic trade of the United States. In the event the obsolete vessel is acquired by the Secretary of Transportation at the time the owner contracts for the construction of the new vessel, and the owner uses such vessel during the period of construction of the new vessel, the allowance shall be reduced by an amount representing the fair value of such use.
 
 
 10
 46 U.S.C. Sec. 1160(d) (1982).
 
 
 11
 Under APL's trade-in contracts, the United States acquired four obsolete vessels in exchange for an allowance of credit upon the purchase price of one new MA Design C9-S-132a vessel. The Government acquired the S.S. President Lincoln and the S.S. President Tyler under Contract No. MA-9180/9181, and the S.S. President Harrison and the S.S. President Monroe under Contract No. MA-9227/9228.
 
 
 12
 Title to APL's obsolete vessels passed to the United States concurrently with the delivery of a bill of sale for each vessel. The contracts also provided for the continued temporary use of the vessels until redelivery by APL and for a reduction of the trade-in allowance to compensate for such use. APL was to redeliver the vessels to the United States in good operating repair at the Suisun Bay National Defense Reserve Fleet Site, Benecia, California, following the period of use, after "deactivating" the vessel and performing the lay-up work necessary to prepare it for storage. This repair and lay-up work was to be performed in accordance with the instructions prescribed in NSA Order No. 64 (3d Rev.). By the terms of the contracts, the United States was required to reimburse APL for one-half of the "fair and reasonable" costs incurred by APL in preparing the vessels for lay-up. APL performed all required repair and lay-up work for each of the traded-in vessels and completed redelivery.[2] MarAd determined that the "fair and reasonable" value of the lay-up work performed was $2,292,728.00 and reimbursed APL for one-half of that amount, or $1,146,364.00.
 
 
 13
 The four agreements provided that the following costs and expenses would be deducted by the Secretary from the trade-in allowance (value) of each of the obsolete vessels at the time of redelivery to the Government:
 
 
 14
 1. One-half of the lay-up costs, as determined by the Government. (Clause 13(d)(1) of Use Agreement).
 
 
 15
 2. Charter hire of $75 per day for off-voyage use of each vessel, and $1,458.60 per day for on-voyage use of the President Harrison and for the President Monroe. (Article 3(b) of the Contract and Clause E of Use Agreement).
 
 
 16
 3. Repairs and insurance incident to such repairs. (Article 6(b)(1) of the Contract).
 
 
 17
 4. Missing inventory. (Article 9(d) of the Contract).
 
 
 18
 The dates of redelivery and amounts and dates of reimbursement of lay-up costs of the four vessels were as follows:
 
 
 19
 Date of Lay Up Date of
 Vessel Redelivery Cost Reimbursement Reimbursement
-------- ---------- ------------- ------------- -------------
Lincoln 11/14/79 $ 539,377.00 12/18/80 $ 269,688.50
Tyler 10/11/79 552,564.00 12/18/80 276,282.00
Monroe 5/20/80 838,708.00 5/29/81 419,354.00
Harrison 1/29/82 362,079.00 6/27/83 181,039.50
 ------------- -------------
 TOTALS $2,292,728.00 $1,146,364.00
 
 
 20
 The contracts to trade in the S.S. Presidents Lincoln, Tyler, Monroe and Harrison reflected the current MarAd policy in place at the time the contracts were executed requiring shipowners to bear 50 percent of the fair and reasonable lay-up costs incurred in the deactivation of a traded-in vessel. APL made no objection to these contract terms, but has alleged in this action that when it executed these contracts, it did so under the belief that this was a standard requirement uniformly applied to all shipowners trading in obsolete vessels for credit under section 510.
 
 
 21
 At the time the agreements were signed and during the period of their performance, no mention was made to APL by MarAd of any possible or proposed modification of this policy.
 
 
 22
 In April 1981, APL learned through a conversation with the Government's contracting officer, Mr. Burt Kyle (MarAd's Director of Ship Operations), that MarAd, in January 1980, had adopted a 100 percent reimbursement formula for lay-up costs. Thus, the former 50 percent reimbursement policy for lay-up costs was, after January 23, 1980, no longer operative. However, by this time, APL had redelivered the S.S. Presidents Lincoln, Tyler, and Monroe to MarAd, and MarAd had reimbursed APL 50 percent of the fair and reasonable lay-up costs incurred in connection with the S.S. Presidents Lincoln and Tyler. APL requested and received a copy of the final policy decision regarding the 100 percent lay-up costs change later in the month and was advised by the contracting officer that the new policy could not be applied to APL's trade-in contracts because they pre-dated the change in policy. APL did not know at this time when the policy had become effective. The following month, in May 1981, APL received the 50 percent reimbursement of lay-up costs for the S.S. President Monroe. In November 1981, APL prepared to redeliver the S.S. President Harrison and requested full reimbursement for lay-up costs. Again, MarAd informed APL that the 100 percent reimbursement policy was inapplicable under the terms of its April 30, 1979 contracts. APL then accepted 50 percent lay-up reimbursement on the S.S. President Harrison, but reserved its right to claim entitlement to the full 100 percent. APL subsequently learned that a proposal for a change in the lay-up reimbursement policy had been under consideration by MarAd staff members in early April 1979 (before APL's trade-in and use agreement contracts had been executed). APL also learned that the lay-up reimbursement policy change had not been formally approved by MarAd until January 23, 1980, when the Assistant Secretary of Commerce for Maritime Affairs signed the policy change.
 
 
 23
 On December 17, 1979, another shipping company, Farrell Lines, Inc. ("Farrell"), and the United States entered into Contract No. MA-9468/9469 in which the United States acquired eight obsolete vessels owned by Farrell in a section 510 trade-in. The Farrell contract provided for 100 percent reimbursement to Farrell of the lay-up costs incurred in the deactivation of the ships, even though the lay-up policy change had not been formally approved by December 17, 1979.
 
 
 24
 On February 18, 1983, APL submitted to the contracting officer its formal claim for the 50 percent lay-up costs it incurred in preparing the S.S. Presidents Lincoln, Tyler, Monroe and Harrison for redelivery and entry into the national reserve fleet. On November 4, 1983, the Maritime Administration issued its final decision denying APL's claim for full reimbursement. This action followed. The parties cross-moved for summary judgment.
 
 Decision
 
 25
 After a trial, the Claims Court handed down its decision in which it ruled for APL on the liability issue, reformed the contract/use agreements, and awarded APL $1,146,364.00 in damages against the Government, and held for the Government on the failure to disclose, discrimination and interest issues. Both parties have appealed and the case is now before us for decision.
 
 
 26
 The contentions of the parties before the Claims Court were described in the decision of that court as follows.
 
 
 27
 The plaintiff believes it is entitled to summary judgment as a matter of law in this case for three reasons. First, it argues that MarAd's refusal to reimburse APL fully for the lay-up costs incurred in connection with the subject trade-ins violates section 510(d) of the Merchant Marine Act of 1936, as amended, 46 U.S.C. Sec. 1160(d), by substantially reducing the net trade-in allowance received by APL below that mandated by section 510(d). Second, it asserts that MarAd's failure to disclose the lay-up policy change to APL, in the context of their contract negotiations, violated the Government's obligation to disclose to its contractors all material information known to the Government but not known to the contractor. Third, the plaintiff contends that MarAd violated its obligation to treat its contractors fairly and equally by giving another shipowner, Farrell Lines, Inc., the benefit of the new policy even though it, like APL, executed its contract before the new policy was finally adopted by MarAd, and because performance under the two sets of contracts substantially overlapped.
 
 
 28
 The defendant counters plaintiff's assertions and demands summary judgment as a matter of law by arguing that: (1) MarAd's established policy that shipowners bear the burden of fifty percent of lay-up costs incurred in connection with trade-ins was a reasonable exercise of its discretionary authority contained in the Merchant Marine Act of 1936, as amended, and did not unreasonably lower the value of APL's trade-in allowance under section 510(d) of the Act; (2) MarAd had no affirmative obligation to disclose to APL consideration by MarAd staff members of a change in policy regarding the treatment of lay-up cost; and (3) there was no discrimination against APL in Farrell's favor because, at the time the Farrell contracts were concluded, formal approval of the lay-up policy change was about to be executed and was anticipated in the contracts.
 
 
 29
 The same arguments and contentions are made by the parties, respectively, in briefs filed by them in the present appeal. In addition, APL says that section 510(d) of the Act (46 U.S.C. Sec. 1160(d)) did not authorize the Secretary to reduce the trade-in allowance received by APL for the four obsolete ships by requiring it to pay one-half of the lay-up costs, and that his [her] action in doing so violated the Act and was illegal. APL contends further that section 510(d) required the Secretary to consider only (1) scrap value, (2) depreciated value, and (3) market value and nothing else in determining the fair and reasonable value of the obsolete vessels. On the other hand, the Government says that sections 510(b) and 510(d) granted the Secretary the authority to acquire the obsolete vessels and to determine their fair and reasonable value, in the exercise of his [her] discretion, in exchange for an allowance of credit. It contends further that this grant of authority fully authorized the Secretary, in determining the fair and reasonable value of the obsolete vessels, to require APL to pay one-half of the lay-up costs, and that section 510(d) did not limit him [her] to a consideration of only scrap value, depreciated value and market value, so long as those items were considered along with other relevant items, such as the lay-up costs, charter-hire costs, and other costs authorized by the contracts and use agreements to be deducted from the trade-in allowance.
 
 
 30
 We have concluded that the position of the Government is the correct one and that it should prevail on this issue. As shown below, there are many reasons and legal principles that support this conclusion. In the first place, the plain meaning of sections 510(b) and 510(d) is that the determination of the trade-in allowance is left to the discretion of the Secretary. The authority for the Secretary to acquire the obsolete vessels and determine their value is found in section 510(b) and not in section 510(d). Section 510(b) states unequivocally that the Secretary "is authorized, subject to the provisions of this section, to acquire any obsolete vessel in exchange for an allowance of credit.... The amount of the allowance shall be determined ... by the Secretary...." (Emphasis added). This grant of authority to the Secretary is not limited or qualified in any way in section 510(b). Therefore, it is clear that under this section the Secretary is authorized by Congress to acquire the vessels and to determine their value.
 
 
 31
 Section 510(d) implicitly reaffirms the authority granted to the Secretary under section 510(b) by providing that the allowance for an obsolete vessel shall be the fair and reasonable value of such vessel as determined by the Secretary. It further provides that in determining the fair and reasonable value of such vessel, the Secretary shall consider its scrap value, its depreciated value, and its market value. The section does not state that the Secretary can only consider the scrap, depreciated and market values and nothing else. Neither does it provide that the value of the vessel shall be the sum of the scrap, depreciated and market values. If Congress had meant this to be the case, it would have said so. Furthermore, the absence of any mention of lay-up costs in the section does not mean that the Secretary may not consider them along with the other costs and expenses listed in the contracts and use agreements that were to be deducted from the trade-in allowance, together with the scrap, depreciated and market values, in determining the amount of the trade-in allowance.
 
 
 32
 In the next place, the record shows that the Secretary, who is charged with administering the Merchant Marine Act, had long interpreted sections 510(b) and 510(d) as giving him [her] the authority to include one-half of the lay-up costs in determining the trade-in allowance for obsolete vessels acquired by the Government under the Act. The facts show that this interpretation had been in existence since 1960, and the Secretary had applied it as a long-standing policy since that date up to the time the agreements were signed in this case on April 30, 1979. During this period of almost 20 years, the Secretary acquired many obsolete vessels for the Government, and in all cases one-half of the lay-up costs was deducted from the trade-in allowance for the vessels. This conformed to the Secretary's construction and interpretation of sections 510(b) and 510(d) of the Act, and was pursuant to his long-standing policy. The Claims Court found that this was the Secretary's current policy when the contracts were signed requiring shipowners to pay one-half of the lay-up costs.
 
 
 33
 There is a well-recognized and well-established legal principle that the Secretary's construction of a statute is entitled to deference and should "not be disturbed except for cogent reasons." McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921). We held in Horner v. Andrzjewski, 811 F.2d 571, 574 (Fed.Cir.1987):
 
 
 34
 As a general rule, a long-standing interpretation of a statute by an agency charged with its administration must be upheld if reasonable. See Young v. Community Nutrition Institute, 476 U.S. 974, 106 S.Ct. 2360, 2364-65, 90 L.Ed.2d 959 (1986).
 
 
 35
 This rule of according deference to agency interpretations of its own statutes and regulations is established by years of court precedents. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); Nabisco, Inc. v. United States, 220 Ct.Cl. 332, 599 F.2d 415, 422 (1979); Newman v. The Vessel Lady Arnnette, 470 F.Supp. 520, 526 (S.C.D.C.1979). Also see Burlington Northern R.R. Co. v. United States, 752 F.2d 627, 629 (Fed.Cir.1985) ("great deference"); Melamine Chems. Inc. v. United States, 732 F.2d 924, 928 (Fed.Cir.1984) ("great weight"); Sode v. United States, 209 Ct.Cl. 180, 531 F.2d 531, 535 (1976) ("great weight").
 
 
 36
 Applying these precedents here, we conclude that we should defer to the Secretary's interpretation of sections 510(b) and 510(d) and other sections of the Act to the effect that he was authorized in his discretion to require APL to pay one-half of the lay-up costs of the obsolete vessels in his determination of their fair and reasonable value as a trade-in allowance.
 
 
 37
 The Act gave the Secretary very broad powers and authority and wide discretion in administering programs under its provisions. In addition to the authority given him [her] by section 510(b), as described above, Title 46 U.S.C. Sec. 1117 authorized him [her] to "enter into such contracts ... as may, in ... his [her] discretion, be necessary to carry on the activities authorized by this chapter ... in the same manner that a private corporation may contract...." 46 U.S.C. Sec. 1117 (1982). The trade-in/use contracts were made under this broad authority and discretion. The contracts set forth the obligations of both parties and imposed conditions for the operation and use of the vessels. Payment of one-half the lay-up costs is but one of the several costs APL agreed to that would reduce the net trade-in allowance. For example, APL agreed that the costs of charter-hire, repairs and insurance incident to such repairs, and missing inventory, along with one-half of the lay-up costs, were to be deducted by the Secretary from the trade-in allowance. However, APL takes the inconsistent position of attacking the authority of the Secretary to deduct the lay-up costs, but does not contest his [her] authority to deduct the other costs, notwithstanding the fact that his [her] authority to deduct all of these costs arises from the same statute and contract/use agreements. At the same time, APL contends that the Secretary can only consider the scrap, depreciated and market values in determining the trade-in allowance.
 
 
 38
 In Seatrain Shipbuilding Corp. v. Shell Co., 444 U.S. 572, 585, 100 S.Ct. 800, 808, 63 L.Ed.2d 36 (1980), the Supreme Court recognized the fact that the Secretary enjoys "broad authority to oversee administration of the Act" and that "the Secretary's discretion in administering ... programs was substantial." Id. at 586, 100 S.Ct. at 808. See also States Marine Int'l., Inc. v. Peterson, 518 F.2d 1070, 1079 (D.C.Cir.1975); and S.Rep. No. 713, 74th Cong., 1st Sess. at 4 (1935) and H.Rep. No. 1277, 74th Cong., 1st Sess. at 2 (1935) where it is stated that the Maritime Authority [Secretary] is given a considerable amount of discretion in the solution of its problems.
 
 
 39
 The Claims Court stated in its decision that, due to present day inflated prices, it "doubts whether ... Congress would be willing to give the carte blanche discretionary call that the defendant [Government] argues for now." Of course, this was speculation on the part of the court. Such speculation did not authorize it to enter a judgment on what it thought Congress would do in the future, any more than on what it thought the Supreme Court would do on a previously decided point of law. A case in point is United States v. Mason, 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973). In that case the Court of Claims held that due to intervening lower court decisions it believed that if a certain point of law that had been previously decided by the Supreme Court should come before the Supreme Court again, it would rule differently. The Court of Claims then entered judgment on the basis of what it thought the Supreme Court's future decision would be. The Supreme Court reversed, holding that its prior decision must be followed since it had not been overruled nor questioned in its subsequent decisions. The same reasoning is applicable to the instant case. The provisions of the Merchant Marine Act of 1936 as enacted must be followed, because they have not been changed by Congress and the Claims Court lacked the power to change them on the basis of current conditions or what it thought Congress would do in the future. Another case in this area of the law is Penfield Co. v. Securities and Exchange Comm'n, 143 F.2d 746, 749 (9th Cir.), cert. denied,, 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614 (1944), where the Ninth Circuit Court of Appeals held:
 
 
 40
 We cannot agree that an inferior federal court may make its prognostication of the weather in the Supreme Court chambers, however well fortified in judicial reasoning, and forecast that the Supreme Court 'seems' about to overrule its prior decision, and outrun that Court to the overruling goal. It is not a fanciful conjecture that, if such guessing contest were permitted, the ingenuity of judges, stirred by varied philosophies of governmental and social regulations, would find rational arguments for overruling a score of Supreme Court decisions.
 
 
 41
 (Emphasis added).
 
 
 42
 The Claims Court invokes section 510(i) in support of its decision in this case. In our opinion, that section is not relevant nor applicable. It was not enacted until 1960 and obviously could not control section 510(d) that was enacted in 1939. Section 510(i) involves the acquiring of newer mariner class vessels by the Government in exchange for obsolete vessels in the National Defense Reserve Fleet that are scheduled for scrapping. Both the traded-in and traded-out vessels are to be valued at their scrap value. For all practical purposes, this section covers a situation that is the reverse of that in the instant case, because it allows the Government to trade obsolete vessels it owns for newer ones, all of which is for the benefit of the Government. Rules for these transactions are different from those governing the exchanges involved in the case before us. Therefore, section 510(i) is not controlling here. It is immaterial to the decision in our case whether the Government is required to pay all lay-up costs on vessels acquired under section 510(i). That section as presently codified (46 U.S.C. Sec. 1160(i)) does not mention section 510(d).[3]
 
 
 43
 In construing and interpreting a statute, it is important to determine the intent of Congress. In this case both parties contend that the legislative history of sections 510(b) and 510(d) support their respective positions. We have carefully considered the portions of the legislative history submitted by the parties and relied on by the Claims Court and have concluded that such history supports the arguments and contentions of the Government.
 
 
 44
 The facts show that the Secretary's policy of requiring shipowners to pay one-half of the lay-up costs of their obsolete vessels in the determination of their reasonable value was established in 1960. In 1965 an amendment to Section 510(d) was proposed to Congress which would have required the Government to bear the entire costs of lay-ups. The chairman of the House Subcommittee on Merchant Marine, after acknowledging the Secretary's Policy and Practice with respect to lay-up costs, stated that Congress did not desire to limit the Secretary's discretion to the extent proposed by the amendment. Vessel Exchange Authority Extension: Hearing Before the Subcommittee on Merchant Marine, 89th Cong., 1st Sess. 81-82 (1965). Thereafter the House rejected the amendment. See also, H.R.Rep. No. 597, 89th Cong., 1st Sess. 4 (1965), U.S.Code Cong. & Admin.News 1965, p. 3562. This rejection of the amendment by the House shows that Congress was aware of the Secretary's lay-up cost policy in 1965. In fact this is acknowledged by the Claims Court in its decision when it stated
 
 
 45
 It is quite true that Congress, in 1965, was aware of MarAd's lay-up reimbursement policy as it existed in 1965....
 
 
 46
 In 1970 representatives of the American Institute of Merchant Shipping, an organization of which APL was a member, urged Congress to amend section 510(d) so as to require the Government to absorb all lay-up costs incurred in section 510(d) transactions. President's Maritime Program, Part 2: Hearings Before the Subcommittee on Merchant Marine of the House Committee on Merchant Marine and Fisheries, 91st Cong., 2d Sess. 339-40 (1970). Once again Congress refused to enact the proposed amendment.
 
 
 47
 The Government says that when Congress rejected the proposed amendments in 1965 and 1970 it did so with full knowledge of the Secretary's policy and practice of requiring shipowners to pay one-half of lay-up costs, and that it approved and ratified this policy and practice by its refusal to amend the statute. We agree. The Court of Claims held in Crawford v. United States, 179 Ct.Cl. 128, 376 F.2d 266 (1967) that appropriation hearings made Congress aware of the interpretation of the statute in that case by the Secretary of Defense and created a presumption that Congress accepted it as a legitimate interpretation. In that case the court said:
 
 
 48
 Fortifying this result even further is the fact that at hearings on appropriations for the overseas school program for the years in question, the Congress was continually made aware of the interpretation placed upon the Act by the Secretary of Defense. This supports "the natural presumption that Congress, in its subsequent actions, accepted them as legitimate interpretations." Allen v. Grand Central Aircraft Co., 347 U.S. 535, 544-545, 74 S.Ct. 745, 751, 98 L.Ed. 933 (1954); Power Reactor Development Co. [v. International Union of Elec., Radio and Machine Workers] supra, 367 U.S. at 408-409, 81 S.Ct. 1529 [at 1535, 6 L.Ed.2d 924]. See Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 319, 78 S.Ct. 752 , 2 L.Ed.2d 788 (1958).
 
 
 49
 Id. at 275 (footnote omitted). See also United States v. Rutherford, 442 U.S. 544, 554, 99 S.Ct. 2470, 2479, 61 L.Ed.2d 68 (1979).
 
 
 50
 There is no doubt that Congress was aware of the Secretary's lay-up cost policy when it rejected the proposed amendments in 1965 and 1970, as well as at all other times. Section 510(f) of the Act required the Secretary to make an annual report to Congress of all transactions consummated under section 510, which, of course, included lay-up cost transactions such as those involved in the instant case. The record does not show whether the Secretary made these reports, but we can assume that he did, because he is presumed to have performed the duties of his office in a correct and legal manner. Section 510(f) provides as follows:
 
 Report to Congress
 
 51
 The Secretary of Commerce shall include in his annual report to Congress a detailed statement of all transactions consummated under the provisions of the preceding subsections during the period covered by such report.
 
 
 52
 46 U.S.C. Sec. 1160(f) (1982).
 
 
 53
 The legislative history mainly relied on by APL consists of a statement by the chairman of the Maritime Commission made in 1939, which was over 20 years before the Secretary's lay-up policy was put into effect. The chairman's statement was made when the trade-in bill was first submitted to Congress as a proposal and before it became a law. In his view, the commission would place an appropriate value on each obsolete vessel limited to the categories specified in the bill. This was merely his opinion before the bill was passed. He was not commenting on the enacted bill, because, as finally passed, it expressly specified that the Secretary could deduct charter-hire costs from the trade-in allowance, a provision the chairman did not mention. APL and the Claims Court cite H.Doc. No. 208, 76th Cong., 1st Sess. 5-7 (1939) (transmitting proposed section 510 to Congress); Hearings, supra, at 1-2; H.R.Rep. No. 824, 76th Cong., 1st Sess. 5-8 (1939); S.Rep. No. 724, 76th Cong., 1st Sess. 7-10 (1939).
 
 
 54
 APL also relies on a statement of Congressman Weichel in 1949 in which he expressed his opinion that the commission's discretion in fixing the trade-in allowance was limited to the factors itemized by statute. This was apparently Weichel's private view, as it was not shown to be the view of Congress nor of any congressional committee. APL cites Amending the Merchant Marine Act, 1936, As Amended, Hearings Before the Subcomm. on Maritime Affairs of the House Comm. on Merchant Marine and Fisheries, 81st Cong., 1st Sess. 59-61, 322 (1949), for Weichel's statement.
 
 
 55
 We are not persuaded that the legislative references cited by APL show any disapproval by Congress of the lay-up policy of the Secretary or any inclination, intent, or effort by it to curtail, lessen or restrict his authority in carrying out the policy.
 
 
 56
 APL contends that it should prevail in this case because the Secretary failed to disclose to APL at the time the agreements were signed on April 30, 1979, that a staff member had proposed to the Office of General Counsel on April 11, 1979, that the 50 percent lay-up policy be changed so that the Government would be required to pay 100 percent of such costs. A change in the policy was not made until some seven months later when on December 3, 1979, a change was finalized. This change was formally approved on January 23, 1980, by the Assistant Secretary. We agree with the Claims Court that the Government does not have to disclose every idea and proposal circulating among staff members, which may or may not be adopted, when it enters into contracts based on what it believes to be valid statutory and regulatory authority. Consequently, there was no liability against the Government for the Secretary's failure to make such disclosures in this case, and we affirm the decision of the Claims Court to that effect.
 
 
 57
 APL also complains that the Secretary unlawfully discriminated against it when he allowed Farrell to have the full benefit of the 100 percent Government lay-up reimbursement policy pursuant to a contract executed on December 17, 1979. As pointed out above, the change in policy had been finalized in the agency on that date but had not been formally approved. There was about a seven months' time difference between APL's contract and that with Farrell. The two contracts had no connection with each other. Farrell's contract did not interfere in any way with APL's contracts, which were fully performed by both parties, nor did it deprive APL of any rights to which it was entitled under its agreements. We affirm the decision of the Claims Court that APL is not entitled to recover on its discrimination claim. It has not stated a claim on which recovery can be had.
 
 
 58
 The Claims Court reformed the contracts/use agreements between APL and the Government so as to provide that the Government would pay all of the lay-up costs of the obsolete vessels, and to require the Government to refund $1,146,364.00 to APL representing the lay-up contributions APL made to the Government pursuant to the agreements at issue. In this, the Claims Court erred. The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds. In the instant case, there was never an agreement nor a meeting of the minds that the Government would pay 100 percent of the lay-up costs of APL's obsolete vessels. In fact, such a proposal was not even mentioned by either party prior to or at the time of the execution of the agreements. The Supreme Court and other courts have held that in the absence of fraud, accident, mistake or illegality, a court of equity cannot change the terms of a contract. See Manufacturer's Fin. Co. v. McKey, 294 U.S. 442, 449, 55 S.Ct. 444, 447, 79 L.Ed. 982 (1935); Hedges v. Dixon County, 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893). See also In Re Four Seasons Nursing Centers of Am., Inc., 483 F.2d 599, 603 (10th Cir.1973). There is no fraud, accident, mistake or illegality in the present case. Therefore, the Claims Court wrote new and different contracts and use agreements for the parties, which they had not agreed to, when it reformed them. The court had no authority to do so. Therefore, we reverse that part of the Claims Court decision that reforms the contracts/use agreements and awards a judgment of $1,146,364.00 to APL against the Government.
 
 
 59
 We do not reach the interest question. Because there is no recovery, there can be no interest.
 
 
 60
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 61
 DAVIS, Circuit Judge, dissenting.
 
 
 62
 To me (1) the wording of Section 510(d), 46 U.S.C. Sec. 1160(d), on its face confines the Government to the three factors specified in that provision; (2) the only pertinent legislative history of the original 1939 amendment confirms that interpretation; (3) Congress never ratified the Government's later "lay-up" practice as now upheld by the court; and (4) the Government's practice cannot prevail over the language and history of the statute, nor need special deference be given that administrative practice which has not been uniform.
 
 
 63
 1. The preferred and normal meaning of the language of Section 510(d) is that in determining the fair and reasonable value of the obsolete vessel the Secretary "shall consider" only the specified factors. This reading may possibly not be the only one--it may be that the bare language can conceivably be read to include consideration of other factors--but I view the Claims Court's interpretation as preferable because the language seems mandatory, there is no hint of any other factor in it or any other part of the Act, no reference in this section (the provision specifically dealing with the trade-in allowance) to the Secretary's having general discretion, and (as I shall point out) no suggestion in the legislative history as to consideration of other factors--rather, quite the opposite. The fact that the Secretary has discretion whether to engage in a trade-in does not at all mean that he also had discretion as to the factors to consider in making the allowance, especially when the relevant provision explicitly lists the factors to be considered.
 
 
 64
 2. When Section 510 was added in 1939, the Chairman of the Maritime Commission explicitly said the following in presenting this trade-in amendment to Congress:
 
 
 65
 The allowance suggested by the Commission and stated in the bill would be the fair and reasonable value of the old vessel, as determined by the Commission after consideration of the following factors: (1) The scrap value of the obsolete vessel both in American and in foreign markets; (2) the depreciated value based on a 20-year life; and (3) the market value thereof for operation in the world trade, or in the foreign or domestic trade of the United States.
 
 
 66
 The Commission, after consideration of the age of the vessel, its physical condition, and world and United States market conditions, would assign whichever value it found to be most appropriate to the circumstances, limited however to the categories specified in the bill (emphasis added).
 
 
 67
 Merchant Marine Bill, 1939, Hearings Before the House Comm. on Merchant Marine and Fisheries in H.R. 5130 (Part II), 76th Cong., 1st Sess. 1939, at 2. In answer to various proposed modifications proffered by shipping interests, the Commission urged:
 
 
 68
 The three items for consideration set out in the bill give the Commission a sufficiently wide range of discretionary power in arriving at the value of a vessel, and it is believed that a just and reasonable approximation of the real value can be fixed thereunder.
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 The Commission, in framing the turn-in suggestion has been most careful to incorporate therein only those considerations which may be considered to arise by reason of the restriction of section 9 of the Shipping Act, 1916, as amended. The Commission hopes the proposal will remain on that basis.
 
 
 72
 Id. at 182-83. Section 510(d) was adopted by Congress as drafted, proposed and explained by the Maritime Commission. Such contemporaneous construction by the proposers and administrators of the measure is most significant. United States v. Vogel Fertilizer Co., 455 U.S. 16, 31, 102 S.Ct. 821, 830, 70 L.Ed.2d 792 (1982); Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969); United States v. Zucca, 351 U.S. 91, 96, 76 S.Ct. 671, 674, 100 L.Ed. 964 (1956).
 
 
 73
 3. Congress never ratified the Maritime Administration's later interpretation of Section 510(d) as authorizing imposition of "lay-up" costs. In 1965 the Administration did briefly explain the then "lay-up" policy at a committee hearing to consider (among other things) problems dealing with "lay-up" costs, but the committee report contented itself with saying that that matter was not "germane to this bill" and the committee "did not feel that legislation was the proper way to correct" the problems discussed by the Committee of American Steamship Lines representatives, but that the committee hoped the Administration would consider the complaints against the "lay-up" policy so that "errors or unfairly burdensome requirements will not occur in the future." H.R.Rep. No. 597, 89th Cong., 1st Sess. 4 (1965), U.S.Code Cong. & Admin.News, 1965, p. 3564. This may not have been an outright rejection of the "lay-up" policy, but it was certainly not a ratification of it. There was also a summary reference to the "lay-up" policy at the 1970 hearings, but no committee report ever referred to that subject. Both these bits of alleged "history" reflect precisely the kind of Congressional inaction and silence that normally is entitled to no weight in construing a statute. See, e.g., Advanced Micro Devices v. C.A.B., 742 F.2d 1520, 1541 (D.C.Cir.1984).[1]
 
 
 74
 4. No deference should be accorded the Government's "lay-up" policy both because (a) that policy is contradicted by the text of Section 510(d) and its legislative history when it was enacted, as well as thereafter, and (b) the Maritime Administration's policy has not been long continued or uniform. I point out in paragraph 1, supra, that the Chairman of the Maritime Commission made it clear at the time of enactment that Section 510(d) mandated use of only the specified factors. It is not known when the policy applied in 1979 (to appellee) was adopted but I assume that that policy began in 1960 and continued until 1979; in January 1980, however, the policy was changed so that "lay-up" costs were to be borne by the Government. That is the type of oscillating administrative interpretation of a statute which is not owed special deference as against other dominating guidelines for statutory interpretation.
 
 
 75
 The result for me is that this is a case in which statutory language combines with the legislative history to sustain the Claims Court's understanding of Section 510(d). See Texas State Comm'n for the Blind v. United States, 796 F.2d 400, 415-16 (Fed.Cir.1986) (separate opinion of Davis, J.). I would therefore affirm on the Government's appeal.[2]
 
 
 
 [1]
 Prior to August 6, 1981, The United States acted through the Secretary of Commerce, the Assistant Secretary of Commerce for Maritime Affairs and the Maritime Administration ("MarAd") in section 510 contract transactions. Effective August 6, 1981, MarAd was transferred to the Department of Transportation by operation of Pub.L. No. 97-31
 
 
 [2]
 Since title had already passed to the Government, the vessels were considered "redelivered" to the Government when the Government actually took possession of the vessel at the reserve fleet site
 
 
 [3]
 Section 510(i) (46 U.S.C. Sec. 1160(i)) provides:
 Exchange of vessels; valuation; scrapping of traded-out vessels
 The Secretary of Transportation is authorized to acquire mariner class vessels constructed under subchapter VII of this chapter and Public Law 911, Eighty-first Congress, and other suitable vessels constructed in the United States, which have never been under foreign documentation, in exchange for obsolete vessels in the National Defense Reserve Fleet. For purposes of this subsection, the trade-in and trade-out vessels shall be valued at the higher of their scrap value in domestic or foreign markets as of the date of the exchange: Provided, That in any exchange transactions the value assigned to the traded-in and traded-out vessels will be determined on the same basis. The value of the traded-out vessel shall be as nearly as possible equal to the value of the traded-in vessel plus the fair value of the cost of towing the traded-out vessel to the place of scrapping. To the extent the value of the traded-out vessel exceeds the value of the traded-in vessel plus the fair value of the cost of towing, the owner of the traded-in vessel shall pay the excess to the Secretary of Transportation in cash at the time of the exchange. This excess shall be deposited into the Vessel Operations Revolving Fund and all costs incident to the lay-up of vessels acquired under this chapter may be paid from balances in the Fund. No payments shall be made by the Secretary of Transportation to the owner of any traded-in vessel in connection with any exchange under this subsection. Notwithstanding the provisions of sections 808 and 835 of this title, vessels traded out under this subsection may be scrapped in approved foreign markets. The provision of this subsection (i) as it read prior to the 1975 amendment shall govern all transactions made thereunder prior to that amendment.
 
 
 [1]
 It is also noteworthy that in 1965 and 1970 "lay-up" costs were very much less than those imposed on appellee in this case
 
 
 [2]
 Because of my views on the Government's appeal, I need not reach the issues of whether (1) the Government unlawfully failed to disclose to appellee the change in "lay-up" policy, or (2) the Government unlawfully discriminated between contractors. Because of the court's disposition of the appeal, I do not reach American President Lines' cross-appeal as to interest