**ECC INTERNATIONAL CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 97–64C.

United States Court of Federal Claims.

April 5, 1999.

---

Melvin Rishe, Sidley & Austin, Washington, DC, for plaintiff.

C. Coleman Bird, Washington, DC, with whom were Acting Assistant Attorney General David W. Ogden and Larry J. Gusman, Department of the Air Force, for defendant.

## OPINION

MILLER, Judge.

This contract case is before the court after argument on the parties' cross-motions for summary judgment. The issues under consideration are (1) whether the Economic Price Adjustment ("EPA") clause operates in periods of delayed performance, and (2) whether a modification to the contract entitles the contractor to account in its EPA clause calculation for a two-year delay in performance of Contract Line Item Number ("CLIN") 0006.

## FACTS

The following facts are undisputed, unless otherwise noted.[1] On April 21, 1989, the Department of the Air Force (the "Air Force") awarded Contract No. F33657–89–C–0018 to ECC International Corporation ("plaintiff"). The contract called for the design, development, testing, and delivery of a suite of Maintenance Training Devices ("MTDs") for the purpose of training the Air Force's maintenance personnel on the C–17–A aircraft. The contract also required plaintiff to provide related management, technical, and engineering data, as well as a MTD Support Center, a warranty, and site activation. The basic requirements of the contract were set forth in Contract Line Item Numbers ("CLINs") 0001–0005, requiring an initial production suite of trainers for Site 1. CLINs 0006–0009 corresponded to options for an additional four production suites, for Sites 2 through 5, respectively. Although established as firm, fixed-price, option CLINs 0006–0009 were subject to adjustment under an Air Force EPA clause, which permits adjustment to contract price to account for fluctuations in labor and material costs caused by unanticipated inflation patterns.

On January 23, 1990, the Air Force unilaterally executed its option under CLIN 0006 through the issuance of Modification P00006. The contract, prior to its modification, required plaintiff to complete performance of CLIN 0006 by July 1, 1992. On or about August 29, 1990, the parties executed Modification P00008, which increased the contract price, but did not change the delivery schedule for work under CLIN 0006. The parties approximately two years later bilaterally executed Modification P00022, at the center of the instant dispute.

Modification P00022 extended the delivery date for the CLIN 0006 line items from July 1, 1992, to April 1, 1994; extended the schedule for the Site 1 trainers; and permitted the Air Force to store the Site 2 trainers at plaintiff's facilities at no additional cost.[2] In-

---

1. The factual account that follows provides a broad background to the events preceding the instant dispute. Because the parties' arguments target a complex, vexing clause, certain facts central to these arguments shall be considered in the discussion of law for the sake of clarity.

2. Plaintiff and defendant dispute the cause of the 21–month delay. Defendant maintains that "[a]s part of P00022, the Air Force agreed to a 21–month extension of the delivery date for the CLIN 0006 line terms, from July 1, 1992 to April 1, 1994." Def's Proposed Findings of Uncontroverted Fact No. 9, filed Nov. 25, 1998. To the

extent that defendant contends that plaintiff requested the delay in the completion date for CLIN 0006, additional inflationary costs it incurred plaintiff dismisses this position as "patently false;" "[defendant] disingenuously argues ... that [plaintiff] is seeking reimbursement for increased costs due to inflation during a period of *contractor*-requested delay." Plf's Statement of Genuine Issues No. 9 n. 3, filed Dec. 23, 1998. Plaintiff's Director of Contracts, Wayne C. Sullivan, avers that the Air Force requested the extension "in part because it had not completed construction of the Air Force building at Altus Air Force base where the trainers were to be

corporated by reference into the modification was a letter from plaintiff's Director of Contracts, Wayne C. Sullivan, to the Air Force contracting officer, dated May 19, 1992. The letter states, in pertinent part:

As additional consideration for a modification revising the delivery schedule, ECC agrees to accept an extension of the Site 2 (Option 1) delivery schedule to 1 April 1994 and a one-year delay in the option exercise (and thence one year delivery extension) for Site 3 (Option 2) at no change in the firm-fixed prices (with EPA) set forth in the contract. For EPA purposes, the FY breakouts for labor and material bases will require adjustment by contract modification to accommodate the delay to other FY's without changing the total of the bases for each site as shown in [the EPA clause].

In the months following the execution of Modification P00022, Mr. Sullivan submitted to the Air Force numerous proposals requesting the adjustment under the EPA clause to account for the delay in performance of CLIN 0006. The amount requested in these proposals varied. In a meeting attended by Mr. Sullivan and Air Force Contracting Officer Robert O. Davis, who succeeded Mr. Phoenix in 1994, plaintiff proposed an adjustment for the CLIN 0006 line items in the amount of $802,505,358.00; this request was superseded by letter, dated February 9, 1995, in which Mr. Sullivan proposed an adjustment in the amount of $821,233.00. Plaintiff contends that "all of Mr. Sullivan's proposals were consistent with the proposal for accounting for delay set forth in . . . the May 19, 1992 letter." Plf's Statement of Genuine Issues No. 17.

Based on the Air Force's interpretation of the EPA clause, the contracting officer responded to Mr. Sullivan's February 9, 1995 proposal with proposed Modification P00048, which increased the CLIN 0006 contract price by $166,822.00. On June 28, 1995, Mr. Sullivan returned to Mr. Davis

proposed Modification P00048 unsigned, accompanied by a letter stating that "[t]he modification does not represent any prior agreement between the parties as to an equitable adjustment for the [EPA] provisions of the contract, and does not properly or fairly compensate [plaintiff] for the adjustment due."

By letter dated August 18, 1995, to Contracting Officer Theresa A. Cochran,[3] Mr. Sullivan reiterated that plaintiff considered "resolution of the EPA adjustment matter through negotiations to be in the best interest of both parties to the contract." Among the issues impeding amicable resolution, Mr. Sullivan identified the "many areas of error and interpretation" in the EPA clause rendering "a straight-forward calculation of an appropriate EPA adjustment . . . not possible," as well as the parties' inability to agree on the proper period of adjustment. As was the case with his earlier correspondence with the Air Force, Mr. Sullivan, in the August 18, 1995 letter did not refer specifically to Modification P00022 as a basis for plaintiff's method of calculating the proper adjustment.

On or about September 5, 1995, the Air Force unilaterally executed Modification P00048 pursuant to its authority under the Changes clause, *see* 48 C.F.R. § 52.243–1 (1998), increasing the contract amount for CLIN 0006 by $166,822.00. Plaintiff filed its certified claim with the contracting officer on June 26, 1996, requesting an adjustment to the CLIN 0006 price in the amount of $810,087.00. The contracting officer's final decision, issued October 10, 1996, rejected plaintiff's CLIN 0006 EPA calculation because, *inter alia*, it failed to adhere to the clear language of the clause. The calculation performed by the contracting officer, as reflected in her final decision, determined that plaintiff was entitled to an increase of $46,425.00 for the CLIN 0006 line items. Defendant takes the position that plaintiff did not present to the contracting officer its claim based on Modification P0002 and the perti-

---

shipped." Affidavit of Wayne C. Sullivan, Sept. 18, 1998, ¶ 8. Plaintiff explains that it seeks "an EPA adjustment for the as a consequence of the Air Force-requested delay, and specifically does not seek a similar adjustment for later delays

requested by [plaintiff]." Plf's Statement of Genuine Issues No. 9 n. 3.

3. Ms. Cochran succeeded Mr. Davis as Contracting Officer on this contract.

nency of plaintiff's May 19, 1992 letter modifying the clause.

## DISCUSSION

### I. · Operation of the EPA clause

The EPA clause is a contractual device used to predict the cost of performance of a contract obligation scheduled to occur at a time subsequent to the time of contracting. According to its terms, the EPA clause requires adjustment in the price of designated contract line items if inflation rates cause a discrepancy between forecasted costs and actual costs for labor and material in excess of an established threshold. As is the case with any firm, fixed-price contract, the parties in the instant matter bound themselves to an agreed-upon price, aware that the cost of actual performance may be more or less than anticipated at the time of contracting. Recognizing the inflexibility of this arrangement to accommodate unanticipated fluctuations in inflation, the parties inserted into the contract an EPA clause that adjusted the contract price if actual costs deviated from forecasted costs by more than 2%. Thus, save those inflationary fluctuations within the 2% threshold, the clause prevented either party from receiving a windfall by marginalizing the impact of a cost variable over which neither party retained control.

The EPA clause specifies its conditions and manner of operation. Paragraph (a) precludes any adjustment during the first two years of the contract and designates the Government Fiscal Year ("GFY"), 1 October through 30 September, as the period to which adjustments should correspond. Paragraph (b) refers to tables incorporated directly into the contract that indicate forecasted costs, by line item, of labor and material in the years of anticipated performance.

These tables, prepared by plaintiff, provide amounts for each line item in "Base Year" dollars and "Then Year" dollars. The Base Year was identified as GFY 1989. For each labor or material expenditure designated by line item, plaintiff provided its cost if incurred in 1989 and a projected cost, adjusted for inflation, if incurred in the "Then Year" of scheduled performance.[4] Paragraph (c) excludes certain elements from the clause's calculation, including profit, depreciation, the cost of money, royalties, leases, and the effect of any fixed price subcontracts that did not have an EPA clause. Paragraph (d) identifies the two indices disseminated by the Bureau of Labor Statistics used to measure the extent of actual change in the cost of labor and material by GFY, while ¶ (e) sets out the projected labor and material index rates for GFY 1993 through GFY 2005, which were premised on the inclusion of a 3% inflation factor from the base year of the contract, GFY 1989.[5]

Paragraph (f) of the clause is the most critical to understanding how properly to calculate the adjustment:

(f) The economic price adjustment is determined as follows:

(1) The forecasted 12–month average index rate for labor is subtracted from the actual 12–month average index rate using the same GFY for both. The difference is divided by the projected 12–month average index rate. Then, the forecasted 12–month average index rate for material is subtracted from the actual 12–month average index rate using the same GFY for both. The difference is divided by the projected 12–month average index rate. The labor and material quotient are each multiplied by 100, to obtain the percentage change in the labor and material indices. If the difference is greater than plus or

---

4. For example, for GFY 1998, regarding Labor and related overheads, the Base Year cost was $1,686,879.00 and the Then Year cost was $2,201,040.00. A comparison of GFY 1998 and GFY 2005 demonstrates inflation's substantial effect on forecasted costs for different years. For GFY 2005, the Base Year cost for Labor and related overheads was $1,686,492.00, nearly identical to the GFY 1998 Base Year cost for Labor and related overheads; however, the Then Year cost for GFY 2005, adjusted for seven more

years of inflation, was $2,706,315.00, or $505,-275.00 more than the corresponding cost for GFY 1998.

5. For example, the projected material index rate for GFY 1993 was 1.255, which is the product of $1.03 \times 1.03 \times 1.03 \times 1.03$. Similarly, the projected material index rate for GFY 1994 was 1.593, or $(1.03)^5$, representing an escalation in inflation at a rate of 3% across five GFYs.

minus 2.0%, adjustment is calculated as described in the following paragraphs. If the sum is less than 2.0%, no adjustment is made.

(2) If an adjustment is to be made, then apply the following steps in the computation worksheet.

The computation worksheet, ¶ (m) of the clause, employs a detailed hypothetical to demonstrate how the calculation should be performed.

Because Modification P00022 extended the completion date for CLIN 0006 from July 1, 1992, to April 1, 1994, plaintiff's actual performance of CLIN 0006 occurred during GFY 1992 through GFY 1994, approximately two years later than the period forecasted by the contract. The Then Years identified in the tables prepared by plaintiff no longer corresponded to the actual period of performance. In its certified claim to the contracting officer, plaintiff prefaced its EPA calculation methodology by explaining that "the adjustment formula has been applied to the FY 92–94 periods, as compared with the projections for FY 90–92, to accurately reflect the escalation experienced by the contractor and the very purpose of the EPA provision that was included in the subject contract."

Contract interpretation is a matter of law that is amenable to disposition on summary judgment. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir.1998); *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *Beta Systems, Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988) (citing *Corbin on Contracts* § 554 (1960) ("The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law.")).

The parties agree that only two dispositive issues are present. The first relates to the proper interpretation of the EPA clause and, in particular, the operation of the EPA clause—if it does operate—during periods of delayed performance. Plaintiff adds that this issue also involves the effect of the numerous alleged ambiguities in the EPA clause upon plaintiff's proposed adjustment. The second is whether Modification P00022,

which incorporated Mr. Sullivan's May 19, 1992 letter, entitles plaintiff to account for a two-year delay in the performance of CLIN 0006 in its EPA clause calculation. Plaintiff contends that its motion for summary judgment relates only to the second issue and that no material fact relevant to the second issue is in dispute.

Plaintiff's argument in support of its motion is threefold: (1) The court does not lack subject matter jurisdiction on the ground that plaintiff failed to present its claim to the contracting officer; (2) the contracting officer retained the authority necessary to effect plaintiff's interpretation of the EPA clause through the issuance of bilateral Modification P00022; and (3) Modification P00022 is a legally binding modification to the contract.

### 1. *Validity of claim*

■ Section 609(a)(3) of the Contract Disputes Act of 1968, 41 U.S.C. §§ 601–613 (West 1987 & Supp.1998) (the "CDA"), grants the Court of Federal Claims jurisdiction over valid claims presented within 12 months of a contracting officer's final decision. "[F]or the court to have jurisdiction under the CDA, there must be both a valid claim ... and a contracting officer's final decision on that claim." *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541–42 (Fed.Cir.1996). Although the CDA does not define what constitutes a valid claim, *see Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir.1995), the Federal Acquisition Regulation, implementing the CDA, defines a claim as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. (FAR) § 33.201 (1998). This definition requires that a claim be "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." *Reflectone,* 60 F.3d at 1575.

■ Submission of a valid claim to a contracting officer requires the contractor to specify its bases for relief. *See Mingus Con-*

*structors, Inc. v. United States*, 812 F.2d 1387, 1394 (Fed.Cir.1987). Although no prescription requires that a claim be "submitted in any particular form or use any particular wording," the contractor must provide "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987).

■ Defendant contends that, because plaintiff's certified claim to the contracting officer did not refer to Modification P00022 or allege a breach of an agreement pursuant to Modification P00022, plaintiff has failed to meet the CDA standard. Defendant makes the point that, without adequate notice of the claim, the contracting officer could not issue a final decision on it. On this basis defendant seeks dismissal of plaintiff's claim for lack of subject matter-jurisdiction under the CDA.

Plaintiff rejoins that its reliance on Modification P00022 to support the propriety of its interpretation of the EPA clause does not constitute a new claim for purposes of the CDA. Relying primarily on *Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 418 (1987), plaintiff argues that a claim in the Court of Federal Claims resting on the same operative facts constitutes the same claim as that submitted to the contracting officer, and that the introduction of a new legal theory to support original claims generally does not constitute a new claim. "[R]ather than rely[ ] solely on the reasonableness of its construction of the EPA clause, [plaintiff] also relies on the fact that, during pre-trial preparation, [plaintiff] rediscovered that six years earlier the parties had contractually agreed to apply the EPA Clause in a way that would account for the delay." Plf's Br. filed Dec. 23, 1998, at 5.

In its certified claim to the contracting officer, plaintiff observed that the EPA clause contained significant errors and omissions requiring the contractor to make a number of critical assumptions in order to fulfill the clause's intent and accommodate the effect of the delay of actual performance of CLIN 0006. Plaintiff disputed the efficacy of Modification P00048, claiming that the

contracting officer "unilaterally identified his view of EPA price revisions to line items, and erroneously and without any legal basis included provisions waiving the contractor's right to contest that unilateral modification." Plaintiff prevailed upon the contracting officer to accept its adjustment, which was "based upon factors ... wholly consistent" with the intent the clause:

> In order to reflect the realities of performance, the adjustment formula has been applied to the FY 92–94 periods, as compared with the projections for FY 90–92, to accurately reflect the escalation experienced by the contractor and the very purpose of the EPA provision that was included in the subject contract.

Plaintiff cautioned in its claim that both parties previously had acknowledged that application of the EPA clause in a "strictly literal manner" permitted an adjustment far more favorable to plaintiff than that requested, reserving the right to take advantage of such a "literal, strict reading" if the parties did not reach an amicable resolution.

Understandably, the contracting officer's decision does not address the effect of plaintiff's May 19, 1992 letter, or the effect of its incorporation into Modification P00022. Her decision determined plaintiff's calculation of the EPA clause was unacceptable for two reasons: "[T]he first reason is because it is in direct violation of the EPA clause, and the second reason is because it is in direct conflict with the agreed to purpose of the EPA clause." The contracting officer singled out plaintiff's attempt to subtract forecasted index rates linked to GFY 92 from actual index rates linked to GFY 94 as violating the clause's provision mandating that the calculation be performed "using the same GFY for both." The decision also faulted plaintiff's methodology for not accurately isolating the effect of inflation nor reflecting the clause's underlying purpose:

> [P]laintiff's methodology does not account for the realities of the escalation which were experienced during actual contract performance, but rather seeks to shift the risk of cost growth [plaintiff] assumed by entering into a Firm Fixed Price contract. The cost growth was not caused by infla-

tion but by [plaintiff's] inability to meet the schedule as forecasted by [plaintiff]. . . . There is no rational or equitable consideration that would justify this shift of risk from [plaintiff] to the Air Force.

The foregoing supports two conclusions: First, plaintiff did not provide to the contracting officer adequate notice of its claim involving the effect of Modification P00022 on the application of the EPA Clause; second, the contracting officer did not issue a final decision to that effect. Plaintiff's certified claim urged the contracting officer to accept its application of the EPA clause on the sole ground that it purported to be reasonable and consistent with the clause's intent. Plaintiff did not refer to or rely on Modification P00022 or Mr. Sullivan's May 19, 1992 letter that is the foundation of plaintiff's present claim. The certified claim did not suggest, explicitly or implicitly, that plaintiff and the Air Force had executed a binding agreement modifying substantially the operation of the EPA clause. As a consequence, the contracting officer did not address, in any respect, whether Modification P00022 (1) incorporated the May 19, 1992 letter; (2) affected the application of the EPA clause, assuming that it did incorporate Mr. Sullivan's May 19, 1992 letter; or (3) accounted for the delay in the performance of CLIN 0006, as plaintiff would suggest, assuming that it did affect the application of the EPA clause.

Plaintiff's argument that the contracting officer should have known to consult Modification P00022, as well any external documents incorporated therein, is unpersuasive. The most evident flaw is that plaintiff assumes that, had the contracting officer read the contract as an "integrated whole," Plf's Br. filed Dec. 23, 1998, at 6, she would have verified the legal sufficiency of the alleged agreement between Messrs. Sullivan and Phoenix incorporating the May 19, 1992 letter into Modification P00022 and ultimately endorsed the propriety of plaintiff's interpretation of the EPA clause based on Modification P00022. These are the precisely the issues at the center of plaintiff's appeal, and both are strenuously contested. Plaintiff may not overcome its failure to provide adequate notice of a claim that it "rediscovered," Plf's Br. filed Dec. 23, 1998, at 5, by imputing to the contracting officer the conclusions that plaintiff presumes she would have drawn had such claim been presented properly.[6]

## 2. *Contracting officer's authority*

Assuming that Messrs. Phoenix and Sullivan intended to modify the EPA clause by incorporating the May 19, 1992 letter into Modification P00022, plaintiff contends that Mr. Phoenix had sufficient authority, as contracting officer, to bind the Government to this agreement. Defendant disputes that Mr. Phoenix had such authority and that, if

---

**6.** *Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415 (1987), is not "factually on point," Plf's Br. filed Dec. 23, 1998, at 4, and can be distinguished. Defendant sought dismissal of plaintiff's claim as not the same as that presented to the contracting officer. The court concluded that the claim before the court involved the same operative facts and sought the same category of relief, reasoning:

> At the contracting officer level, Cerberonics simply stated the elements of its claim and left to the CO the task of determining the applicable contract provisions on which to base a ruling. In this forum, Cerberonics has cited specific contact provisions and an implied-in-fact contract theory to frame its claim for relief. As such, plaintiff's complaint augments the legal theories underlying its claim. But it does not change the essence of that claim—*i.e.*, that plaintiff is entitled, based on its contractual relationship with defendant, to compensation . . . .

*Id.* at 418–19. In the instant case, plaintiff's claim does not merely augment the legal theories presented to the contracting officer. Plaintiff's claim relies on facts—most prominently, the circumstances surrounding the alleged agreement executed by Messrs. Sullivan and Phoenix to modify the EPA clause—that were never presented to the contracting officer and never addressed in a final decision.

Plaintiff also relies on *Cosmic Construction Co.*, 82–1 BCA ¶ 15,696, at 77,630, 1982 WL 6966, for the proposition that a reviewing body should "retain jurisdiction where it would be a useless, time-consuming, and expensive . . . to return the question to the Contracting Officer to write an obvious decision." *See Westclox Military Prod.*, 81–2 BCA ¶ 15,270, 1981 WL 7124; *Cincinnati Electronics Corp.*, 79–2 BCA ¶ 14,145, 1979 WL 2421; *El–Tronics, Inc.*, 61–1 BCA ¶ 2,961, 1961 WL 303. The complexities of the EPA clause, acknowledged by plaintiff, and the factually contentious posture of this case render any disposition by the contracting officer far from obvious.

he intended to agree to the modification, the agreement must be considered a nullity.

■ It is well established that the Government is not bound by the acts of its agents beyond the scope of their actual authority. *See Harbert/Lummus Agrifuels Projects v. United States,* 142 F.3d 1429, 1432 (Fed.Cir.1998). "Contractors dealing with the United States must inform themselves of a representative's authority and the limits of that authority." *Id.* (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). "Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). The contractor bears the burden of proving that the Government agent had the actual authority necessary to bind the Government. The contractor's belief regarding the scope of the agent's authority to bind the Government is irrelevant. *See id.*

■ Defendant directs the court's attention to the applicable Air Force procurement regulation to the effect that "[a]ll cost index method EPA clauses shall be approved by the chief of the contracting office." AF FAR Supp. § 5316.203–4(d)(2)(i) (Jan.1992). Because the subject clause is a "cost index method EPA clause," defendant contends that Mr. Phoenix did not have the authority to modify the EPA clause without the approval of the Air Force's Head Contracting Activity (the "HCA"), Director of Manufacturing and Contracting.

Unlike Modification P00008, in which the parties merely repriced the line items in the EPA tables, plaintiff's construction of the EPA clause, as modified by Modification P00022, expands the clause's scope to account for a delay in performance. Plaintiff asserts that "[n]either the plain terms of AF FAR 5316.203–4 nor any other regulation restricts the contracting officer's normal post award authority or otherwise bar him or her from construing the terms of an EPA clause

or modifying it to effectuate its purpose." Plf's Br. filed Dec. 23, 1998, at 8. Accommodating a delay in performance, however, is not within the express purpose of the EPA clause. Moreover, it is undisputed that plaintiff's application of the clause, pursuant to Modification P00022, departs from the express provision requiring that indices for actual and forecasted rates be calculated "using the same GFY for both." These modifications are not inconsequential and effect a meaningful, significant change to the clause that the HCA neither considered nor approved. Plaintiff has not cited to any statute, regulation, or precedent that would permit Mr. Phoenix to circumvent the mandate in AF FAR Supp. 5316.203–4. As a result, plaintiff's construction of the EPA clause, as allegedly modified by Mr. Phoenix pursuant to the execution of Modification P00022, cannot be binding upon the Air Force.

### 3. *Effect of Modification P00022*

Paragraph 8 of the May 19, 1992 letter states, in part: "For EPA purposes, the FY breakouts for labor and material bases will require adjustment by contract modification to accommodate the delay to other FY's without changing the total of the cost bases for each site as shown in [the EPA clause]." Because the success of plaintiff's motion relies almost entirely on its interpretation of this language, whether the May 19, 1992 letter properly was incorporated into the contract and is binding upon both parties is of critical importance.

Plaintiff maintains that the language of Modification P00022, in which the contracting officer noted expressly that the May 19, 1992 letter was "hereby incorporated by reference," formed a legally binding integrated agreement. According to plaintiff, the parties indisputably intended to incorporate all of the terms and conditions of the letter and that "[t]he plain language of the May 19, 1992 [letter] clearly evinces an intent by the parties to account in the EPA clause for the delay in performance of CLIN 0006." Plf's Br. filed Sept. 21, 1998, at 12. Defendant disagrees that the incorporation of the letter into the contract constitutes an agreement— or manifests an intent on the part of the

contracting officer to agree—that the EPA clause would protect plaintiff against inflation during the period that performance of CLIN 0006 was delayed. It is defendant's position that Mr. Phoenix inadvertently failed to exclude the sentence addressing delay in Mr. Sullivan's May 19, 1992 letter when he incorporated the letter by reference into Modification P00022.[7]

The question thus devolves to whether plaintiff can enforce a contract modification to which defendant asserts the Air Force never assented. An express contract requires intent to be bound, and such intent must be expressed in a manner capable of understanding. *See Russell Corp. v. United States,* 210 Ct.Cl. 596, 608, 537 F.2d 474, 480 (1976). Unconditional acceptance must be established. *See id.* "It is essential ... that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain." *Id.* at 609, 537 F.2d 474. In addition to mutuality of intent to contract and lack of ambiguity in offer and acceptance, consideration is also necessary to bind the Government. *See City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). Manifestation of mutual assent will not be present "if the parties attach materially different meanings to their manifestations and ... neither party knows or has reason to know the meaning attached by the other ...." *Restatement (Second) of Contracts* § 20 (1981).

The record reveals that neither Mr. Phoenix nor Mr. Sullivan assented to modify the EPA clause, as plaintiff now suggests, at the time Modification P00022 was executed. Mr. Phoenix explains:

> During the course of the negotiations and discussion that preceded the execution of P00022, I had no discussion at any time with Mr. Sullivan or any other representa-

tive of [plaintiff] regarding modifying or adjusting the [EPA clause] of the Contract, or changing the way that an adjustment would be calculated under the EPA Clause, to reflect or account for the delay in the delivery of the CLIN 0006 MTDs. Similarly, I had no discussion at any time during these negotiations about adjusting the prices of the various items (Sub-CLINs) contained in CLIN 0006 to account for the delay in the performance of the CLIN 0006 work. Mr. Sullivan never mentioned these subjects, and never indicated in any discussion with me, or to the best of my knowledge and information, to anyone else within the Government that [plaintiff] expected, or had conditioned its agreement to P00022 upon its understanding, that the EPA Clause would be modified or adjusted to reflect or account for the delay, or that the prices for these line items would be adjusted, under the EPA Clause or otherwise, to compensate [plaintiff] for any increase in labor or material costs due to inflation during the period of this delay in the performance of the CLIN 0006 contract work. I never at any time reached any agreement with Mr. Sullivan or anyone else at ECC regarding modifying or adjusting the EPA Clause, or regarding the Clause's operation or application to the prices for the CLIN 0006 line items.

Declaration of Kenneth L. Phoenix, Nov. 23, 1998, ¶ 4. Mr. Sullivan could not explain in deposition why plaintiff did not include Modification P00022 as a basis for relief in its certified claim before the contracting officer. Not only did his correspondence with the Air Force preceding the filing of plaintiff's certified claim neglect to refer to Modification P00022 as a legal basis for plaintiff's application of the EPA clause, but plaintiff's com-

---

7. Mr. Phoenix states:

Prior to the execution of P00022, I reviewed Mr. Sullivan's letter dated May 19, 1992 ... and notice the language contained in ¶ 8 of this letter.... Because Mr. Sullivan had never raised or mentioned [plaintiff's] desire to adjust by a future contract modification "the FY breakouts for labor and material bases" in order "to accommodate the delay," and because I knew that I had made no such agreement and that there was no language in

P00022 to this effect, I disregarded this language in the May 19, 1992 letter. By inadvertence, I did not exclude this part of the May 19, 1992 letter from the language in P00022 that incorporated the May 19, 1992 letter by reference. I never intended to agree, and never did agree, to [plaintiff]'s proposal contained in this part of the May 19, 1992 letter.

Declaration of Kenneth L. Phoenix, Nov. 23, 1998, ¶ 5.

plaint more than once denies that Modification P00022, or any other Modification to the contract, affected the operation of the EPA clause on CLIN 0006.[8] Regarded collectively, this evidence compels the conclusion that the "meeting of the minds" necessary to bind the parties did not exist at the time of Modification P00022's execution.

Plaintiff insists that "[t]he plain language contained in the four corners of Modification P00022 clearly and unequivocally expresses an intent by the parties to enter into the agreement reflected in paragraph 8 of the May 19, 1992 letter." Plf's Br. filed Dec. 23, 1998, at 10. Therefore, plaintiff rejects extrinsic evidence, including parol evidence, to establish the actual intent of the parties or to interpret an integrated agreement.

▇▇ As a general rule, extrinsic evidence may not be received to interpret or change the terms of a contract that is clear on its face. *See SCM Corp. v. United States*, 230 Ct.Cl. 199, 206, 675 F.2d 280, 284 (1982); *Cray Research, Inc. v. United States*, 41 Fed.Cl. 427, 436 (1998). Regarding the extent to which the parties' intent may affect the meaning of a contract term, *Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed.Cir.1988), is instructive. In that case, which also addressed the operation of an EPA clause in a government contract, the parties adduced evidence in the form of conflicting affidavits expressing each party's re-

spective understanding of the EPA clause's proper application. The court recognized the general rule pronounced in *SCM Corporation*, yet concluded that, "[t]o the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution." *Id.* at 1183.

▇▇ The instant facts resemble closely those in *Beta Systems*. Defendant, relies on, *inter alia*, Mr. Phoenix's declaration evincing that he neither intended nor agreed to modify the EPA clause. In contrast, Mr. Sullivan's affidavit points to his May 19, 1992 letter, in which he states plaintiff's position that "the EPA adjustment relating to CLIN 0006 would have to account for the additional inflation [plaintiff] would experience as a result of the delay in performance of CLIN 0006." Affidavit of Wayne C. Sullivan, Sept. 18, 1998, ¶ 9. If incorporated into Modification P00022, as plaintiff contends, the May 19, 1992 letter introduces a purpose not contemplated by the unmodified EPA clause and calls for a calculation in violation of the clause's express terms. Ample evidence suggests that neither Mr. Phoenix nor Mr. Sullivan understood that Modification P00022 would affect the operation of the EPA clause. Nonetheless, because a facial dispute of material fact creates an ambiguity in the EPA

---

8. Defendant recites the following averments from plaintiff's complaint:

> Complaint ¶ 26 (none of the contract modifications (like P00022) that granted schedule extensions "expressly address[ed] the implications of such extensions on the operation of the EPA Clause"); ¶ 30 ("[n]one of these modifications [specifically including P00022, among others] contained language which addressed or adjusted the application of the EPA Clause in the Contract, as a result of the shifts in the timeframes of performance"); ¶ 32 ("[n]either in the Contract Modifications which extended the delivery schedule for the relevant CLINs, nor in Contract Modification P00008, was any recognition given to the actual or prospective impact on those CLINs of the operation of the EPA Clause"); ¶ 38 ("[w]hile these delays were agreed upon in Contract Modifications ... P00022, ... the provisions of these Contract Modifications did not address application of EPA clause to CLIN 0006"); ¶ 43(d) ("[f]urthermore, as noted above, the Government ex-

ecuted five other Contract modifications [other than P00008, but including P00022] which incorporated schedule delays, without in any way affecting application of the EPA Clause to the relevant CLINs"); ¶ 51 (the contracting officer's final decision allegedly ignores "the fact that the parties mutually agreed upon schedule changes with regard to CLIN 0006, without in any manner constraining the application of the EPA Clause to the prices which would be charged within the revised delivery schedule").

Def's Br. filed Nov. 25, 1998, at 32. Notwithstanding defendant's argument that the foregoing "constitute judicial admissions that are binding upon [plaintiff]," Def's Br. filed Nov. 25, 1998, at 33, the complaint further underscores the assertion that Mr. Sullivan did not intend to modify the EPA clause. Plaintiff concedes as much in its brief, admitting that "during pre-trial preparation, [plaintiff] rediscovered that six years earlier the parties had contractually agreed to apply the EPA Clause in a way that would account for the delay." Plf's Br. filed Dec. 23, 1998, at 5.

clause's proper application, the matter cannot be resolved by summary judgment.

### 4. *Reformation*

In both its certified claim to the contracting officer and in its complaint, plaintiff asserts that it proposed "a reasonable and equitable adjustment—one that is mathematically equivalent to the binding agreement memorialized in Modification P00022—which is consistent with [plaintiff's] understanding as to the purpose of the Clause and the agreement in Modification P00022." Plf's Br. filed Dec. 23, 1998, at 29. Because of alleged ambiguities in the clause, plaintiff takes the position that the clause was impossible to apply as written. Therefore, plaintiff reformed certain terms in its proposal to achieve an adjustment reflecting plaintiff's understanding of the clause's purpose. Defendant responds that, as a matter of law, plaintiff may not invoke reformation to remedy any perceived ambiguities affecting the clause's fair or reasonable application.

 "Reformation serves to bring the parties' written contract in accord with their agreement." *Atlas Corp. v. United States,* 895 F.2d 745, 750 (Fed.Cir.1990). "The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds." *American President Lines, Ltd. v. United States,* 821 F.2d 1571, 1582 (Fed.Cir.1987). "[I]n the absence of fraud, accident, mistake or illegality, a court of equity cannot change the terms of a contract." *Id.* (citing *Manufacturers' Fin. Co. v. McKey,* 294 U.S. 442, 449, 55 S.Ct. 444, 79 L.Ed. 982 (1935), and *Hedges v. Dixon County,* 150 U.S. 182, 192, 14 S.Ct. 71, 37 L.Ed. 1044 (1893)). A court should not decree reformation unless there exists convincing evidence that the parties intended and agreed to the terms that the court is asked to enforce. *See Atlas Corp.,* 895 F.2d. at 750.

 Convincing evidence has not been adduced that the parties intended Modification P00022 to alter the operation of the EPA clause such that it would account for periods of delayed performance. Mr. Phoenix's declaration and Mr. Sullivan's affidavit belie any meeting of the minds regarding the effect of Modification P00022 on the operation of the EPA clause. Defendant correctly notes that "[t]he remedy for any ambiguities that the Court might find in the Clause is not reformation of the Clause to fashion a bargain that the parties themselves did not make." Def's Br. filed Feb. 17, 1999, at 3. In the absence of a mutual understanding, enforcement of the contract per plaintiff's interpretation of the clause would unduly and inequitably prejudice the Government.

 Plaintiff argues, in the alternative, that reformation is possible because, at the time of contracting, the parties were mutually mistaken with respect to when CLIN 0006 would be performed. "Where there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent, reformation ... may be available to the adversely affected party." *Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 665 (Fed.Cir. 1992). The party seeking reformation must show that

(1) the parties to the contract were mistaken in their belief regarding a fact;

(2) that mistaken belief constituted a basic assumption underlying the contract;

(3) the mistake had a material effect on the bargain; and

(4) the contract did not put the risk of the mistake on the party seeking reformation.

*Atlas Corp.,* 895 F.2d at 750. The erroneous belief held by the parties must relate to an existing fact. *See Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir. 1994). A prediction or judgment regarding an event to occur in the future, if erroneous, does not constitute a "mistake," as the term is contemplated within the doctrine of mutual mistake of fact. *See id.* at 1203 (citing *Restatement (Second) of Contracts* § 151 cmt. a (1981)). Plaintiff did not attempt to demonstrate that its claim complied with any of the required factors. In any event, because plaintiff's claim relates the parties' expectations of a future event, to wit, the date of performance of CLIN 0006, the doctrine of mutual mistake cannot be invoked.

### 5. The EPA clause

In addition to contending that the clause clearly and unambiguously precludes the "windfall" plaintiff seeks, see Def's Br. filed Feb. 17, 1999, at 5, defendant's cross-motion minimizes the alleged ambiguities in the EPA clause cited by plaintiff as not substantial enough to warrant overturning the contracting officer's decision. Plaintiff entreats that "the EPA Clause is so fraught with ambiguity that it is impossible to apply as written and [plaintiff's] proposed adjustment provides a reasonable construction of the Clause consistent with the purpose of the clause and the intent of the parties."[9] Plf's Br. filed Dec. 23, 1998, at 14. In other words, plaintiff argues that the same ambiguities, omissions, and inconsistencies on which it bases its claim for reformation of the EPA clause also must preclude summary judgment in defendant's favor, because the clause cannot be applied as written.

When construing a contract, the court is to read the contract as a whole and give meaning to each of its provisions. See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed.Cir.1996). The court looks first to the contract's plain meaning. See Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed.Cir.1993); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991). " '[A]n interpretation which gives a reasonable meaning to all [of a contract's] parts will be preferred to one which leaves a portion of it useless, inexplicable, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " Gould, 935 F.2d at 1274 (quoting Arizona v. United States, 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)). The court must not render any portion of the contract meaningless. See Fortec, 760 F.2d at 1292; Thanet Corp. v. United States, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). A contract should be interpreted to effectuate its purpose. See Northrop Grumman Corp. v. Goldin, 136 F.3d 1479, 1483 (Fed.Cir.1998). However, "[t]he court construes the meaning of particular terms, not according to the actual intentions of the parties at the time but, rather, objectively, as would a 'reasonably intelligent person acquainted with the contemporaneous circumstances.' " Cray Research, Inc. v. United States, 41 Fed.Cl. 427, 434 (1998) (quoting Hol–Gar Mfg. Corp. v. United States, 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965)). Although parties to a contract may disagree as to the meaning or implication of certain provisions, a contract is not necessarily thereby rendered ambiguous. See Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1578 (Fed.Cir.1993). Ambiguity results from drafting that "is susceptible of two different and reasonable in-

---

9. Plaintiff identifies several genuine issues of material fact to preclude summary resolution in defendant's favor. First, plaintiff disputes defendant's assertion that the EPA clause is intended to adjust only "abnormal," "unanticipated," or "significant," fluctuations in inflation, and that "the undisputed facts establish that the Government and [plaintiff] never agreed that the EPA Clause would protect against inflation during periods of delayed performance." Def's Br. filed Nov. 25, 1998, at 3. Plaintiff's understanding of the clause is that it would not bear "any risk of inflation . . . beyond the two percent threshold," Plf's Br. filed Dec. 23, 1998, at 16. Plaintiff notes that the mere fact that the parties did not discuss the effect of delay on the EPA clause prior to contract performance did not alter plaintiff's understanding that it would be protected from all inflationary costs, "including increased costs resulting from the additional inflation experienced as a result of a Government-requested delay." Id. at 18. Second, plaintiff disputes defendant's assertion that plaintiff caused, alone or concurrently, the delay of performance of CLIN 0006. Third, plaintiff disputes defendant's assertion that the Government was not the sole drafter of the EPA clause.

These issues are not material to the resolution of defendant's cross-motion. Defendant's general description of the clause as intending to apply in the event of "abnormal," "unanticipated," or "significant," fluctuations of inflation merely echoes the clause's provision precluding an adjustment within its 2% de minimis limitation. See Def's Br. filed Feb. 17, 1999, at 5 n. 2. Plaintiff does not dispute that the clause is not intended to apply within this 2% range. Regarding the cause of the delay of the performance of CLIN 0006, while plaintiff is correct that the matter remains in dispute and cannot be determined on summary judgment, defendant contends that the EPA clause does not account for any delay in performance—government-caused or otherwise. Therefore, even if defendant conceded that the Air Force caused the subject delay, defendant's argument would remain intact. Finally, the record shows that the Air Force is responsible for the text of the clause, and that plaintiff provided the pricing data, in table form, required for its application.

terpretations, each of which is found to be consistent with the contract language." *Id.* at 1579.

The EPA clause, unadorned by Modification P00022, is unambiguous in at least two respects. First, no express language or provision accounts for periods of delayed performance. Notwithstanding plaintiff's argument that the clause, as modified by P00022, intends to reimburse the contract for "any" or "all" inflation incurred beyond the 2% *de minimis* limitation, plaintiff has not contended that accommodating delay is within the clause's original purpose.[10] The contracting officer's decision agreed expressly with plaintiff's contention that " 'the primary purpose of an EPA clause is to provide shared-risk of future escalation for out-year periods of performance, where the actual escalation experienced is caused by economic elements outside the control of either party to the contract.' " This undisputed purpose does not contemplate delay. That a clause appears in the contract, distinct from the EPA clause, devoted entirely to "Government Delay of Work," further suggests that expenses incurred by the contractor incident to a delay caused by the Government are not within the ambit of the EPA clause. The second aspect of the clause not tainted by ambiguity is that "[t]he forecasted 12–month average index rate for labor is subtracted from the actual 12–month average index rate using the same GFY for both." Plaintiff has not relied on any contract language, undisputed fact, or tenable legal doctrine that would permit ignoring this mandate, nor has plaintiff identified any ambiguity that would advance its argument. Indeed, several of the

ambiguities on which plaintiff relies to defeat defendant's cross-motion were resolved by the contracting officer in accordance with the proposals proffered in plaintiff's certified claim.[11]

Plaintiff did not apprise the contracting officer that its claim rested on a modification purporting to alter the purpose of the clause, such that the EPA calculation would account for costs related to delay. The contracting officer did not decide whether Mr. Sullivan's letter was properly incorporated into the contract, and if so, whether the modification affected the clause so as to permit the calculation advanced in plaintiff's certified claim accounting for the delay. Consequently, the contracting officer's decision imposed an EPA adjustment in which "the actual 12–month average index rate," as specified in the clause, did not correspond to the years in which performance actually occurred. Without question, the result is curious, although the message is clear that a contractor may not look to the unadorned EPA˙ clause to recover its costs, even those incident to inflation, under circumstances in which a delay is the underlying cause of those costs. To the extent that plaintiff claims that Modification P00022 allows the EPA clause to account for periods of delayed performance, the court cannot render a decision until such claim is presented properly and the contracting officer issues a final decision.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. The parties' cross-motions are denied.

---

10. At oral argument, plaintiff stated:
 [O]ur motion simply is based on the fact that regardless of what [the EPA clause] intended in the beginning and regardless of how that clause should be interpreted, the fact of the matter is that there is a subsequent modification to the contract. And that modification incorporates a provision which says that there has to be a change in this clause because of the delay.
 Transcript of Proceedings, *ECC International Corp. v. United States*, 43 Fed.Cl. 359, 364 (1999) (hereinafter "Tr.").

11. Even if the clause were ambiguous, as plaintiff contends, the court could not simply reform it

to suit plaintiff's interpretation. When confronted with a contract provision permitting two different interpretations giving rise to an ambiguity, the court must determine whether the ambiguity is patent or latent. If patent, the court considers whether the contractor discharged its duty to inquire; if latent, the court considers the interpretations proffered by each party and applies the doctrine of *contra preferentem* against the drafter where appropriate. *See Triax Pac., Inc. v. West,* 130 F.3d 1469 (Fed.Cir.1997); *Interstate Gen. Contractors, Inc. v. Stone,* 980 F.2d 1433 (Fed.Cir.1992); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501 (1963).

2. Pursuant to RCFC 60.1(a), this matter is remanded [12] to the contracting officer to determine: (1) what is the effect of Mr. Phoenix's incorporation of Mr. Sullivan's May 19, 1992 letter by Modification P00022? and (2) does Modification P00022 expand the scope of EPA clause to account for periods of delayed performance? The contracting officer shall render a decision by June 4, 1999.

3. The parties shall file a Joint Status Report by June 18, 1999.

---

12. Defendant agrees that a remand in these circumstances would be appropriate. See Tr. at 19,

